UNITED STATES of America

v.

Albert John THAME, Jr., Appellant.

No. 87–1623.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6),
May 3, 1988.

Decided May 16, 1988.

Robert F. Simone, Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Joan Markman, Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before GIBBONS, Chief Judge, and MANSMANN and COWEN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge.

Albert John Thame, Jr. appeals from the judgment of sentence imposed following his conviction for possession of cocaine with intent to distribute. 21 U.S.C. § 841(a) (1982). He contends that the district court should have suppressed the cocaine that was seized from his luggage. He also contends that the district court erred in allowing the government to present certain evidence and make certain arguments. We will affirm.

### I

Thame was a passenger on an Amtrak train from Fort Lauderdale, Florida to Philadelphia, Pennsylvania. The train left Florida on May 21, 1987 and arrived in Philadelphia on May 22, 1987. Thame did not use his own name, but rather travelled under a reservation made in the name "B. Kelly." An Amtrak investigator in Washington, D.C. reviewed the manifest while the train was underway and discovered that the reservation was made on the day of travel, that no telephone number was given, that a sleeping accommodation was reserved for the northbound trip but not for the return, and that the ticket was paid for in cash. His suspicions aroused, the investigator inquired of personnel at the Fort Lauderdale station whether anyone remembered the passenger. He learned that the passenger had appeared nervous, and had repeatedly asked when the train would leave and whether he could keep his luggage with him. A different Amtrak investigator, Faith Doonan, boarded the train in Washington, and Drug Enforcement agents in Philadelphia were informed of the passenger's description.

The district court conducted a suppression hearing on Thame's motion. What happened when the train arrived in Philadelphia was seriously disputed at the suppression hearing. The version told by Thame conflicts in important respects with the version told by the law enforcement witnesses. The district court, however, credited the testimony of the law enforcement witnesses and found the facts to be as set forth in their testimony. The following factual account is based on that credited testimony.

Philadelphia Police Officer Michael McCue, assigned to the Drug Enforcement Agency, followed Thame up from the platform to the lobby of 30th Street Station while DEA Special Agent John McCarty followed still further behind with Amtrak Investigator Doonan. In the lobby, McCue walked alongside Thame, identified himself, and asked if he could speak with Thame. Thame said that he did not mind. As they continued walking, McCue asked Thame if he had just gotten off the train from Florida, and Thame said that he had. McCue then asked Thame his name, and Thame replied "Albert Thame." McCue then asked if he could see his train ticket. At this point, the two stopped walking as Thame reached into his pocket and produced his train ticket, bearing the name "B. Kelly." Thame, in response to a question from McCue, explained that he was using the ticket of a friend who had to fly back. McCue then asked for identification, and Thame produced a driver's license and old police identification in his correct name. Agent McCarty then joined McCue and

Thame and identified himself. McCue handed the ticket and the identification to McCarty, who looked it over and handed it back to Thame. McCarty then explained that they were working with the Narcotics Interdiction Unit, seeking cooperation from passengers from source cities such as Miami and Fort Lauderdale, and asked if Thame would mind if McCue and McCarty looked in the luggage Thame was carrying. Thame declined, stating that he had "sensitive material" in his bag. McCarty replied that that was fine, that he had an absolute right to refuse, but asked whether it would be okay if they conducted the search in a more private place. Thame again declined. McCarty then asked whether Thame would object to a sniff search of the air around the bag by a dog, as this would be less intrusive. Thame agreed. McCarty then asked if Thame would mind accompanying them to the Amtrak police office, explaining that this would be more private and out of the way. Thame carried his own bag to the office. The entire conversation took about two minutes, and the walk to the Amtrak police office took less than a minute. At the office, a sniff search took place, and the dog indicated that there were drugs in Thame's bag. The sniff search was repeated in another room. A warrant was then obtained, the bag was opened, and cocaine was found. The district court refused to suppress the cocaine.

At trial before a jury, Thame denied knowledge of the cocaine. He testified that he had planned to drive back to Philadelphia but the plans fell through, that he called one airline regarding one particular route and was told that only first class seats were available, and that he decided to take the train and split the cost of a sleeping compartment with "B. Kelly." The thrust of the defense was that Kelly had the opportunity to place the cocaine in Thame's bag without Thame's knowledge. Thame was convicted of possession of cocaine with intent to distribute.

## II

Thame contends that his consent to the sniff test was the product of an unlawful detention, and therefore invalid. However, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him to answer some questions [or] by putting questions to him if the person is willing to listen...." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (plurality opinion) (citations omitted). Moreover, "the fact that the officer identifies himself as a police officer, without more, [does not] convert the encounter into a seizure requiring some level of objective justification." *Id.; see also United States v. Mendenhall*, 446 U.S. 544, 551–57, 100 S.Ct. 1870, 1875–78, 64 L.Ed.2d 497 (1980) (opinion announcing the judgment). A majority of the Court has agreed that a contact in which officers "simply ask [if a defendant] would step aside and talk with them, [is] clearly the sort of consensual encounter that implicates no Fourth Amendment interest." *Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 310, 83 L.Ed.2d 165 (1984) (per curiam). Although we have our doubts whether a reasonable person who is greeted by federal agents and asked for identification feels free to simply ignore the agents, we are not free to substitute our judgment on this question for the Supreme Court's. *See United States v. Notorianni*, 729 F.2d 520, 522 (7th Cir.1984) ("Maybe this is a wrong guess about what the average person feels in this situation ... "); *United States v. Cordell*, 723 F.2d 1283, 1286, (1983), cert. denied, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984) (Swygert, J., concurring) ("I believe that as a factual psychological matter people who are stopped for questioning of this kind by police officers ... generally do not feel 'free to leave' ..."); *see also* Note, *The Drug Courier Profile and Airport Stops: Reasonable Intrusions or Suspicionless Seizures?*, 12 Nova L. Rev. 273, 284 (1987) (lower courts recognize "the artificiality of the test").

In *Royer*, a plurality of the Court rejected the contention that the particular encounter at issue was consensual, stating:

Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment. These circumstance surely amount to a show of official authority such that a reasonable person would have believed that he was not free to leave.

460 U.S. at 501–02, 103 S.Ct. at 1326 (plurality opinion).

■ Turning to the facts of this case, it is clear that it was permissible to ask Thame for his ticket and for identification. Moreover, the officers did not restrain him, block his path, or otherwise control his movement by retaining his papers. *Cf. Cordell*, 723 F.2d at 1285 (majority) and at 1287 (Swygert, J., concurring). Unlike the defendants in *Mendenhall, Royer,* and *Rodriguez,* Thame did not consent to a search after he moved to another area in response to the officers' request, but rather was only asked to move to the Amtrak police office *after* he consented to the sniff test. Thus Thames can only prevail on this argument if the permissible conversation in the lobby of 30th Street Station ripened into an unlawful detention at some point prior to his consent to the sniff test.

Thame argues that he was seized "at the point he refused to consent to the search." Brief at 30. He relies on a decision by the Court of Appeals for the Seventh Circuit which held that when "two agents explained that they suspected [the defendant] of transporting drugs and asked permission to search his luggage, the consensual questioning had ripened into an investigative stop." *United States v. Borys,* 766 F.2d 304, 311 (7th Cir.1985), *cert. denied* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986). The important factor could not have been that the agents asked permission to search, for such a rule would mean that

there is no such thing as a purely consensual search. Instead, the important factor was that "Borys knew that the agents had positively identified him as a suspect." *Id.* As the Court of Appeals for the Eleventh Circuit explained, "Statements which intimate that an investigation has focussed on a specific individual easily could induce a reasonable person to believe that failure to cooperate would only lead to formal detention." *United States v. Berry,* 670 F.2d 583, 597 (5th Cir.1982) (in banc) (cited in *Borys,* 766 F.2d at 311); *see also United States v. Palen,* 793 F.2d 853, 857 (7th Cir.1986).

In this case, however, McCue testified that McCarty explained to Thame that they were trying "to elicit cooperation from passengers coming from source cities," not that they had positively identified Thame as a suspect. Indeed, Thame testified at the suppression hearing that McCarty told him that it was a routine check and that others were also being checked. Thus *Borys* is of no help to Thame.

Thame also notes that there were three law enforcement officials within his sight: McCarty and McCue were speaking to him and Doonan was in the background. While the number of officers involved is certainly a relevant factor in deciding whether an individual has been detained, *see Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877, we do not believe that it is determinative.

The district court's conclusion that Thame consented to the sniff test "[d]uring a period in which he was not under custodial restraint" is in accordance with the law and supported by the record. For this reason, there is no need to consider whether the officers had reasonable suspicion to subject Thame to a limited investigatory detention. *Cf. Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

■ There is no other basis on which the voluntariness of Thame's consent to the sniff test can reasonably be challenged. "Voluntariness is a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). Thame is a former Philadelphia

police officer. He was told that he had an absolute right to refuse a search and did, in fact, refuse. His consent to the sniff test was given in the public area of the train station, after his refusal for a full search was honored, and at a time when he had possession of his ticket, his identification, and his luggage. The district court's finding that Thame's consent to the sniff test was "freely given" is amply supported by the record.

Thame does not dispute that after the sniff test there was probable cause for the issuance of a warrant to search his luggage. We hold, therefore, that the district court did not err in refusing to suppress the cocaine which it contained.

## III

█ Thame also contends that the prosecutor inflamed the jury by stating in closing argument that Thame "wanted to ... distribute [the cocaine] on the streets of Philadelphia or in Wildwood, New Jersey." Trial counsel for Thame immediately objected, stating "There's no evidence of that at all, Your Honor." The court sustained the objection, and later clearly instructed the jury that its recollection of the evidence controlled over any statement by counsel and not to "consider any personal opinions of the attorneys, but only their logical arguments based on the evidence." If a more specific curative instruction were thought necessary, counsel should have requested one before the jury retired. Fed. R.Crim.P. 30.

## IV

Thame also makes a number of arguments for the first time on appeal. Since these points were not properly raised in the district court, Thame can secure relief only if the alleged errors are within the plain error doctrine of Fed.R.Crim.P. 52(b). Rule 52(b) provides:

> Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

Rule 52(b) is not to be used freely. Instead, it

authorizes the Courts of Appeals to correct only particularly egregious errors, those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings. In other words, the plain-error exception to the contemporaneous-objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.

*United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (internal quotations and citations omitted).

In *Young*, the Court of Appeals relied on the plain error doctrine to reverse a conviction, but did not explicitly consider the prejudicial impact of the error in light of the facts of the particular case. 736 F.2d 565, 570 (10th Cir.1984) (per curiam). The Supreme Court reversed, criticizing the Court of Appeals for not viewing the error in context. 470 U.S. at 14–20, 105 S.Ct. at 1045–48. In particular, the Court stated:

> A *per se* approach to plain error is flawed. An error, of course, must be more than obvious or readily apparent in order to trigger appellate review under Federal Rule of Criminal Procedure 52(b). [T]he plain error doctrine ... requir[es] an appellate court to find that the claimed error not only seriously affected "substantial rights," but that it had an unfair prejudicial impact on the jury's deliberations.

470 U.S. at 16 n. 14, 105 S.Ct. at 1047 n. 14.

Justice Blackmun has recently noted that *Young*, by isolating the prejudice inquiry "without giving it any substantive definition," has created confusion in the proper application of the plain error doctrine. *United States v. Robinson*, —— U.S. ——, ——, 108 S.Ct. 864, 870–72, 99 L.Ed.2d 23 (1988) (Blackmun, J., concurring and dissenting). He argued that the Court "should either continue on the path that it started down in *Young* and formulate a test for plain error that articulates the prejudice standard to be applied, or, in the alternative, it should make clear, by reasserting the plain-error doctrine's lack of rigid definition, that its language in *Young*

is not to be interpreted as a test." *Id.* (footnote omitted). He noted that "[t]his latter course may be more true to the doctrine's purpose of allowing courts to single out the rare case in which allowing a conviction to stand would severely undermine the fairness, integrity or public reputation of judicial proceedings." *Id.* (citations and internal quotation omitted).

This court has not interpreted *Young* as establishing a rigid test for plain error. Instead, we have continued to look on a case-by-case basis to such factors as the obviousness of the error, the significance of the interest protected by the rule that was violated, the seriousness of the error in the particular case, and the reputation of judicial proceedings if the error stands uncorrected—all with an eye toward avoiding manifest injustice. *See, e.g., Bennis v. Gable,* 823 F.2d 723, 727 (3d Cir.1987); *Government of the Virgin Islands v. Forte,* 806 F.2d 73, 76–77 (1986); *Government of the Virgin Islands v. Joseph,* 765 F.2d 394, 398 (3d Cir.1985) ("the error must be egregious or otherwise constitute a manifest miscarriage of justice") (quoting *United States v. Dalfonso,* 707 F.2d 757, 761 (3d Cir.1983)); *United States v. Graham,* 758 F.2d 879, 883 (3d Cir.) *cert. denied* 474 U.S. 901, 106 S.Ct. 226, 88 L.Ed.2d 226 (1985). We have not applied the doctrine rigidly. For example, the Supreme Court has suggested that "[b]y its terms, recourse may be had to [Rule 52(b) ] only on appeal from a trial infected with error so 'plain' that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed. 2d 816 (1982); *see also United States v. Castro,* 776 F.2d 1118, 1129 (3d Cir.1985), *cert. denied,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986). Nevertheless, in a case where the trial judge could not be faulted for failing to anticipate a truly un-

expected Supreme Court decision, we stated that if the jury instruction "allowed conviction for conduct outside the proscription of the mail fraud statute, such instruction would constitute ... plain error." *United States v. Piccolo,* 835 F.2d 517, 519 (1987); *cf. United States v. Silverstein,* 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied* 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985) ("To be plain, an error must be conspicuous, at least in hindsight.")[1] With these considerations in mind, we turn to the errors alleged by Thame.

■ Thame claims that his post-arrest silence was used against him. Although Agent McCarty did mention in his testimony that he advised Thame of his *Miranda* rights after the second sniff test, there was no testimony concerning Thame's response (or lack of one) and the matter was not pursued either through further testimony or in argument. If there was any error, it certainly did not undermine the fairness of the trial.

Thame also contends that it was improper for the prosecutor to argue to the jury that his refusal to consent to the full search is evidence that he knew that the bag contained cocaine. In the closing statement, the prosecutor argued:

Now, you might say that the defendant was attempting to be cooperative, and in fact Agent McCarty and Officer McCue testified that he was cooperative, he answered their questions.

But ladies and gentlemen, let me suggest to you that the defendant was attempting to be cooperative for a very specific reason. If he were cooperative, I think he was hoping against hope that Officer McCue and Agent McCarty would just go away. In fact, the defendant produced a police I.D. card absolutely unsolicited.

Why would he produce a police I.D. card? He could show that card to Agent

---

1. As another example, in *Government of the Virgin Islands v. Brathwaite,* 782 F.2d 399, 408 (3d Cir.1986), we granted relief from multiple sentences despite the defendant's failure to raise the issue either at trial or on appeal, reasoning that "to afford one coconspirator relief from multiple sentences without extending the same relief to another coconspirator who received identical sentences would be at best unseemly and at worst a miscarriage of justice." (citations and internal quotation omitted).

McCarty and Officer McCue and say, hey, I'm one of you guys. I'm clean. There's no reason to ask me any further questions.

And it's true that after he refused consent, he refused to cooperate with Agent McCarty by opening his suitcase because he knew what he had in his suitcase, he did consent to having the dog sniff the bag. And when Agent McCarty opened the bag, it was easy to understand why. That cocaine wasn't just thrown in the suitcase in any old way. That cocaine was very, very, very, carefully packaged. It was packaged in a substance that contained talcum powder and pepper. If you open the bag you can smell it for yourselves. Mr. Thame was hoping against hope even knowing that he had cocaine in his suitcase, that somehow the narcotics dog could be fooled. And as we know, that hope did not pan out and the narcotics dog was not fooled.

The thrust of the argument was that Thame's consent to the sniff test was perfectly consistent with knowledge of the cocaine since it was packed in a way to attempt to avoid detection by smell. Thame concedes that this aspect of the argument was proper. Mixed in with this proper argument, however, was the challenged argument that the refusal to consent to the full search is evidence of guilt. In rebuttal, moreover, the prosecutor did not make the concededly-proper argument. Instead, she made the challenged argument the last point of her presentation:

Finally, the defendant testified that he didn't want the Government to search his bag and that's quite obvious, he didn't want the Government to search his bag whether the story happened as Agent McCarty and Officer McCue testified and—or whether it happened as the defendant testified. And I suggest to you that there's a very good reason why he didn't want agents searching his bag and that is because this was in the bag. Again, almost a quarter of a million dollars worth of cocaine.

In *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held that a prosecutor may not argue to a jury that a defendant's exercise of the fifth amendment right to remain silent is evidence of guilt. It reasoned that allowing such comment would be a "penalty ... for exercising a constitutional privilege." 380 U.S. at 614, 85 S.Ct. at 1232–33. This court has not confined the *Griffin* rationale to the fifth amendment. In *United States ex rel. Macon v. Yeager*, 476 F.2d 613 (3d Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973), the defendant consulted an attorney the day after the alleged crime, and the state prosecutor argued that this action was inconsistent with innocence. This court reversed the district court's denial of a petition for a writ of habeas corpus. We held, relying on *Griffin*, that a prosecutor may not argue that a defendant's exercise of the sixth amendment right to counsel is evidence of guilt since such an argument penalizes the exercise of a constitutional right. We saw "little, if any, valid distinction between the privilege against self-incrimination and the right to counsel" which was relevant. 476 F.2d at 615; *see also United States v. McDonald*, 620 F.2d 559 (5th Cir.1980).

We also see little, if any, valid distinction between the privilege against self-incrimination and the privilege against unreasonable searches and seizures which is relevant to the propriety of the prosecutor's argument.[2] Neither did the Court of

2. There may be relevant differences between the fourth and fifth amendment protections regarding the propriety of introducing evidence of the exercise of the right as opposed to arguing for inferences of guilt from the exercise of the right. Evidence of the exercise of the right against self-incrimination will almost always be overwhelmingly prejudicial since, by its terms, invocation of the right suggests a consciousness of guilt. On the other hand, evidence of the exercise of the right to refuse to consent to a search may be relevant, in this case such as this one, to an understanding of the circumstances surrounding consent to a less intrusive investigative method. In addition, since privacy concerns—not just fears of incrimination—can reasonably be expected to motivate reliance on Fourth Amendment rights, evidence of the invo-

Appeals for the Ninth Circuit, which simply cited *Griffin* in holding that a prosecutor's comment on a defendant's refusal to consent to a search was misconduct. *United States v. Taxe*, 540 F.2d 961, 969 (9th Cir. 1976), *cert. denied* 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). Thus, in our view, it was error for the prosecutor to argue that Thame's reliance on his fourth amendment rights constituted evidence of his guilt. Certainly the argument cannot be justified as an invited reply since the prosecutor raised the argument first. *Cf. United States v. Robinson*, — U.S. —, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988).

A contrary rule would undermine the rule of *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). *Simmons* mandates that a defendant's testimony at a suppression hearing not be used against him at trial. This protection would be largely illusory if the fact of reliance on the fourth amendment (easily proven from the court records without using defendant's testimony) could be used against the defendant. Thus if the district court had overruled a defense objection to the argument, we would reverse.

Thame contends that the error is of constitutional dimension, was not harmless beyond a reasonable doubt, and therefore must result in a reversal. If this were the applicable test, we would agree. However, the test for harmless error is not the same as the test for plain error. Instead, "the plain error standard of Fed.R.Crim.P. 52(b) ... is more generous to the government than the Rule 52(a) standard" of harmless error. *United States v. Jonnet*, 762 F.2d 16, 20 (3d Cir.1985). Both the harmless error doctrine and the plain error doctrine are exceptions to the general rule that properly preserved claims of error result in reversals while claims of error that are not properly preserved do not. The harmless error doctrine allows convictions to stand despite properly preserved claims of constitutional error in the exceptional circumstance where the reviewing court can conclude that the error was harmless beyond a

reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The plain error doctrine allows convictions to be reversed even in the absence of properly preserved claims of error where the reviewing court can conclude that fundamental fairness so requires.

The constitutional nature of the error certainly makes it easier to conclude that fundamental fairness requires reversal. Nevertheless, concluding that any time a constitutional claim is at issue the *Chapman* standard applies to the plain error determination collapses the plain error and harmless error doctrines into one and "threatens to render meaningless the contemporaneous-objection requirement in the context of constitutional error." *United States v. Robinson*, — U.S. —, —, 108 S.Ct. 864, 871, 99 L.Ed.2d 23 (1988) (Blackmun, J., concurring and dissenting).

■ Although we do not believe that the error was sufficiently minor to be harmless beyond a reasonable doubt, we also do not believe that it was sufficiently major that a miscarriage of justice will result if the conviction is not reversed. There is considerable other evidence of Thame's guilt. First, of course, Thame was in fact carrying carefully packed cocaine with a street value of $250,000. The possibility that someone gave him an unexpected gift of that value is rather remoté. His actions suggest that he knew that he was carrying the cocaine. He flew to Florida under his own name, but, aware of the security checks at airports, made the return trip to Philadelphia by train under a different name.

Moreover, Thame was a successful owner and operator of establishments at the Jersey Shore with considerable assets; there is scant reason for such a person—immediately before one of the biggest weekends at the shore—to take a 24 hour train ride back to Philadelphia merely because the one airline he checked had only first class seats available on one particular route. There is even less reason for such a

---

cation of these rights may not be as prejudicial. In light of our conclusion below that the argument was not plain error, we need not decide whether the admission of the evidence itself was error at all, since it certainly was not plain error.

person to split the cost of the sleeping compartment with "B. Kelly" in order to save money. Moreover, the heart of Thame's defense—that "B. Kelly" was on the train and must have placed the cocaine in his bag—was severely undermined by Thame's statement in the train station that he was using a friend's ticket because the friend had decided to fly. Lastly, Thame's statement that he had "sensitive materials" in his bag could quite reasonably be taken as a reference to the cocaine, since he has never pointed to anything else that was found in the bag that warranted this description.[3] While Thames had no obligation to take the stand and put on evidence, once he did so, the holes in his story constitute evidence against him.

In addition, the error here can hardly be said to have been obvious. Even in the briefs to this court, neither party pointed to a single case holding that the prosecutor's argument was improper, nor was the argument so obviously improper that the reason for the dearth of such caselaw is the very outrageousness of the argument. We cannot conclude that the error was sufficiently egregious to warrant invocation of the plain error doctrine. Nor do we see how the public reputation of judicial proceedings will be damaged if the conviction is allowed to stand. In short, we see no manifest injustice to justify reversal despite the absence of a contemporaneous objection.

*United States v. Branson*, 756 F.2d 752 (9th Cir.1985), which Thame asserts is dispositive, is readily distinguishable. First, *Branson* involved prosecutorial comment on the exercise of the right to remain silent; comment the impropriety of which is both more established and more prejudicial than the comment involved here. In addition, the prejudice in *Branson* was palpable: The jury specifically asked if they could base their decision on Branson's silence and the district judge replied that they could base their decision on any evidence they thought relevant. 756 F.2d at 754; *see also United States v. Puig*, 810 F.2d 1085, 1088 n. 9 (11th Cir.1987) (distinguishing *Branson* and concluding error was harmless); *United States v. Ortiz*, 776 F.2d 864 (9th Cir.1985), *cert. denied*, 475 U.S. 1097, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986) (same).

V

The suppression motion was properly denied. The court's instruction adequately cured the prosecutor's error in speculating about Thame's intention to distribute cocaine on the street. Thame's post-arrest silence was not used against him in any prejudicial manner. Neither the prosecution's comment on Thame's assertion of fourth amendment rights nor the introduction of evidence demonstrating that assertion is plain error requiring a reversal. The judgment appealed from will, therefore, be affirmed.

3. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him to answer some questions, by putting questions to him if the person is willing to listen, *or by offering in evidence in a criminal prosecution his voluntary answers to* *such questions."* *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (plurality opinion) (citations omitted) (emphasis added). Thus while the exercise of the constitutional right to refuse a search is protected, explanatory statements given in a non-custodial situation are admissible.