**UNITED STATES of America**

v.

**Wilber PEARSON.**

**Crim. A. No. 90–00026.**

United States District Court,
E.D. Pennsylvania.

April 9, 1990.

Karl Lunkenheimer, Asst. U.S. Atty., Philadelphia, Pa., for the Government.

Felicia Sarner, Philadelphia, Pa., for defendant.

LOUIS H. POLLAK, District Judge.*

The defendant's motion to suppress physical evidence seized on August 21, 1989, raises some important questions, questions that are not easily resolved. The basic facts are relatively clear.

At approximately 10:00 p.m., on August 21, 1989, Officer Abel, a Philadelphia police officer attached to the Drug Enforcement Task Force, was in his vehicle in a parking lot outside a Wawa. He observed a BMW come in and park. He saw two persons, black males, get out of the BMW and greet and shake hands with a third person, and after some conversation the two gentlemen—who in the event turned out to be Mr. Pearson, the accused, and a passenger, a Mr. Hawkins, the driver—got back into the BMW. The third person, to whom they were talking, got into a car which Officer Abel testified was a "Chrysler product," meaning evidently that it may have been a Plymouth or a Dodge. He wasn't sure.

---

* This bench opinion has been slightly edited with    a view to improving intelligibility

He thought it was a late '70s or early '80s model. The BMW is thought to be shiny and new.

There is ambiguity which results from a discrepancy between Officer Abel's testimony and statements that he apparently made in reporting the incident at the time, as reported by other officers, on whether he observed the non-BMW vehicle enter the parking lot, or whether, as Officer Abel testified today on the witness stand, he did not see that car enter the parking lot, but saw the person greeted by Messrs. Hawkins and Pearson get into the "Chrysler product" and go away at the same time the BMW went away.

There is also some discrepancy about the identity of that other car, though Officer Abel is clear in his current testimony that it was a "Chrysler product." The report of a Bensalem officer based, according to the officer, on what Officer Abel told him, identified that car as a Thunderbird.

I recite these discrepancies, but I do not attach any significance to them, since I think the narrative does not alter the legal implications—whatever may be the actual facts with respect to the brand of the car and whether Officer Abel perceived it drive into the Wawa parking lot at about the same time as the BMW arrived, or whether it had been there before Officer Abel was looking at the BMW and its occupants and the person who, in due course, got into the so-called "Chrysler product" and drove away in it.

I appreciate that the point was made, and properly, by defense counsel that these discrepancies between Officer Abel's testimony and what was reported as his recital at the time reflect in some measure on his clarity of perception and recollection. But these discrepancies do not seem to me to go to the fundamentals of his narrative.

Suffice it to say, that Officer Abel saw the BMW, and what he now remembers as being a "Chrysler product," leave together, the "Chrysler product" going first. And he, Officer Abel—and being on what he describes as "downtime" during intervals of an investigation which involved wiretapping and attendant surveillance, at a point when no telephone conversations were going on, and, hence, no surveillances were indicated—decided that the encounter between the three persons there in the parking lot, followed almost at once by their departure in two cars in the same direction, was "suspicious." Officer Abel decided to follow them to see what might eventuate. By "suspicious," Officer Abel meant suspicious in the context of his, Officer Abel's, experience as a narcotics officer.

In particular, Officer Abel had participated in, according to his testimony, numerous undercover drug purchases in which a common scenario was for the undercover officer making the purchase to meet the proposed seller in the parking lot, as a public place with substantial visibility, and then would repair to some agreed upon other place to conclude the transaction. So it's against that background that Officer Abel found what he then viewed as suspicious.

He followed the two cars until they stopped at a parking lot outside an apartment complex. The BMW driver and passenger, Mr. Hawkins and Mr. Pearson, got out of the BMW and joined the driver of the "Chrysler product" and a fourth person. Officer Abel was uncertain whether that fourth person was a woman in the second car—the "Chrysler product car"—or not. But all four were together in the parking area outside the apartment complex. All four went into the apartment complex out of Officer Abel's vision. He stayed and watched.

After a while, the person he had seen driving the "Chrysler product" came out, got into his "Chrysler product" car, went away and returned at a later time. Again, there's a discrepancy between Officer Abel's testimony that 15 minutes elapsed, and what evidently was the report he made, at least as recorded by the Bensalem reporting officer, that perhaps 50 minutes elapsed. Once again, I note the discrepancy. I do not note any significance that is attendant on it.

That person got out of his "Chrysler product," this time carrying a yellow plastic bag which appeared to have something

in it, though what that was, Officer Abel had no way of telling. He went into the apartment complex. Not long thereafter, Messrs. Hawkins and Pearson emerged. Officer Abel's current testimony is that Mr. Hawkins was carrying a yellow plastic bag, which appeared to be the one that he had just seen brought into the apartment complex. What, evidently, Officer Abel had reported on the evening of August 21, was that Mr. Pearson was carrying the yellow plastic bag. Again, there is, in my judgment, no significance that attaches to that discrepancy, but I note it.

Messrs. Hawkins and Pearson got into the BMW and started off. Officer Abel decided to follow them with a view to stopping the vehicle, and so advised his colleague, Officer Kane, who in turn asked assistance from Bensalem police officers. The pursuit was near the Philadelphia Bensalem Township line.

In due course, the BMW was stopped. Officers Kane and Abel approached the car, Kane on the passenger side, Abel on the driver's side. They both shined their flashlights into the car. Officers Kane and Abel both testified that they saw, with the flashlight illumination, a gun in the car on the floor on the passenger side. Officer Kane perceived it as the butt of the gun sticking up vertically between the legs of the passenger. One of the Bensalem officers said that the first thing he heard—he did not observe visually this aspect of the stop—was Officer Kane saying something to the effect of, "I have a gun," or "I have a gun here," and that, thereafter, Messrs. Hawkins and Pearson were ordered out, pulled out of the BMW, Mr. Hawkins in Officer Abel's charge, Mr. Pearson in Officer Kane's charge, searching, patting down and frisking Mr. Pearson.

Officer Kane found a .357 Magnum in the waistband of his [Mr. Pearson's] trousers. That was a gun additional to the gun which Officers Kane and Abel said that they saw in the illumination of the flashlight. That gun, observed by the officers on the floor on the passenger's side, was reported in the Bensalem report as having been found under the passenger's seat.

Messrs. Hawkins and Pearson were taken into custody and brought to Bensalem Police headquarters. After some interrogation, Mr. Hawkins was let go. Mr. Pearson was detained and charged with gun possession.

In January of this year, the Bensalem authorities turned over to Alcohol, Tobacco and Firearms authorities the guns, plus the other items seized in search of the car which ensued after Messrs. Hawkins and Pearson were taken out of the car and their guns removed. Those other items were a yellow plastic bag, inside of which were found shells, shells for a .22 and also shells for a .357, plus approximately $200 in one dollar bills.

The first argument made by the defense is that the stopping of the vehicle was unjustifiable. The second contention made by the defense is that even assuming there was a ground for stopping the BMW, there was no basis for searching the car. The position taken by the defense is that, contrary to the testimony of Officers Abel and Kane, no gun could have been in plain view.

The Government's position is that Officer Abel was justified in stopping the BMW because he had a reasonable suspicion within the framework of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

The Government alternatively contends that even if there were not a sufficient basis for stopping the BMW to qualify under the *Terry/Sokolow* line, stopping the car was permissible under the line of authority which in this Circuit is reflected in *United States v. Thame,* 846 F.2d 200 (1988), wherein the Court of Appeals sustained a so-called interdiction stop by a Drug Enforcement officer of an Amtrak passenger near the 30th Street Railroad Station. Under *Thame,* such an approach to a passenger does not require any threshold demonstration of reasonable suspicion. *Thame* is a case in which the court explained the pattern of inquiry pursued by drug enforcement officers at 30th Street, in which they examine people's manners, e.g.,

nervousness, whether they have baggage, whether they are coming from another city, such as New York or Miami, which is a source of drugs, et cetera.

There are quite important differences between a *Thame* approach and a *Terry/Sokolow* approach. Under the *Thame* approach, by hypothesis all that is involved is going up to a person at an entirely public place—the 30th Street terminal seeming to be a common venue—and asking the person whether that person would be willing to talk. If the person agrees to talk, the person may, depending on the nature of the information provided, be asked if he or she will consent to a search. But the person approached and interrogated is, by hypothesis, free to terminate the conversation at any time. That is to say, the person is not under any obligation to remain in conversation with the officer, let alone to submit to a search.

Under *Terry* and *Sokolow* what is permitted is a stopping on a showing of reasonable suspicion, which is something less than probable cause, together with at least a limited frisk of the person that is stopped. In *Sokolow,* the stopping was followed by the escorting of the person stopped to the DEA office, and an examination by a sniffing dog of the stopped person's shoulder bag. That, in turn, evidently gave ground for the securing of a search warrant.

■ To my knowledge, there have been no examples in the Supreme Court or in the Third Circuit of a stopping of an automobile on the basis of what I will call the *Thame* rationale. On the face of it, I would regard the application of the *Thame* line of authority to the stopping of an automobile as a very substantial and rather improbable extension. The stopping of an automobile on a highway is quite clearly a far more substantial intervention by law enforcement officers with the mobility of other persons, namely those in a stopped vehicle, than an approach by a law enforcement officer in a railroad terminal to another person who is walking through the terminal—an approach that simply involves asking the person approached whether that person is willing to stop and talk.

In the course of argument, it appeared that at least one reason why Government counsel was offering the *Thame* rationale as an alternate ground for justifying the action undertaken here, was that Officer Abel, in his testimony, said that it was his expectation that on stopping the BMW he would ask those in the automobile whether they would agree to a search of the car, with the understanding that if they did not agree, the car would then be free to leave.

On further inquiry, Officer Abel testified that it was a relatively common experience that persons stopped on the highway, because they became nervous or otherwise, fairly readily assented to an automobile search.

I have said that I find a very substantial difference between the *Thame* doctrine on the one hand, and the *Terry/Sokolow* doctrine on the other. I further said that an extension of *Thame* to authorize the stopping of a car on the highway seems to me a very substantial extension, and one that I would find difficult to support. On the facts of this case, I would find it insupportable.

■ So I turn to what I suppose to be the Government's principal ground for supporting the stopping here—a ground which is challenged by the defense. That principal ground is the Government's assertion, and the defense's denial, that Officer Abel had a reasonable suspicion warranting the stopping of the BMW.

In *Sokolow,* the Supreme Court said, "The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch'." 109 S.Ct. at 1585 (citing *Terry*). The Supreme Court went on to say, "The fourth amendment requires 'some minimal level of objective justification' for making the stop. *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence."

The question here, in short, is whether Officer Abel's ground for stopping the BMW had reached the threshold of what, in *Delgado*, the Supreme Court referred to as "some minimum level of objective justification."

Counsel for defendant has pointed out that everything which Officer Abel observed from the moment he first saw the BMW and its occupants in the parking lot outside of Wawa, until he saw Messrs. Hawkins and Pearson leave the apartment complex and get into the BMW, with one of them carrying a yellow plastic bag, was, as a matter of objective visualization, legitimate activity. No piece of the narrative was not subject to innocent explanation—that is true. Yet, it does not, in my judgment, conclude the matter.

In *Sokolow* itself, if one takes the various elements that the Supreme Court found in the aggregate to reach the level of reasonable suspicion, every one of those items was susceptible of an entirely innocent explanation. So, too, was the activity reviewed by the Court of Appeals in *United States v. Hawkins*, 811 F.2d 210 (1987).

The question, in my judgment, which is the governing question, is whether the aggregate of activity—each element of which has at least one potential innocent explanation, and perhaps many potential innocent explanations, viewed in their totality through the prism of the informed experience of the observing law enforcement officer—gives rise to reasonable grounds that arrive at a "minimum level of objective justification."

In this instance, Officer Abel made observations essentially in two phases. The first phase was the encounter at the Wawa parking lot, persons meeting at a parking lot, shaking hands, getting into cars and going off in the same direction. That was a phase which, in Officer Abel's view, was like the phase with which he was familiar, of persons meeting in a parking lot at the initiation of a negotiation for a drug transaction.

In Officer Abel's experience, that phase would commonly be followed by the negotiators leaving to go to an agreed, more private place for the consummation of the transaction. It was with that "suspicion" in mind that Officer Abel decided to follow the two cars which departed together.

The second phase of Officer Abel's observation was at the apartment complex. He followed the two cars into the parking area. He observed the persons in those two cars alight from the cars and go into the apartment complex accompanied by a woman, who may or may not have been in the "Chrysler product." He then observed one person leave, and in due course come back with a yellow plastic bag. He then observed the two persons who had driven in the BMW, who had greeted the plastic bag-carrier in the Wawa parking lot, emerge from the apartment complex with what appeared to Officer Abel to be the same plastic bag.

At that point, Officer Abel felt that he had very likely seen the completion of a drug transaction: a conventional part of such deals as he had participated in them, and was familiar with them, was that the seller would leave the private place to which the negotiators repaired, and go off somewhere and return with the drugs that were to be the subject of the transaction. The exchange would then take place, and the purchaser would depart with the drugs that had been bought.

With the departure of Messrs. Pearson and Hawkins, Officer Abel felt that he now saw people leaving in a car who probably had with them purchased drugs. On that basis, he thought that a stop of the car was in order, although, as noted, he testified that he merely expected to ask the permission of those in the BMW to search, and also contemplated that they might agree to a search, as he testified frequently seems to happen.

In my judgment, up to the point of arrival at the apartment complex, what Officer Abel had was a mere suspicion, a conjecture or a "hunch," to use a word used in *Terry* and *Sokolow*. In my judgment, however, what Officer Abel observed at the apartment complex brought that initial "hunch" up to a "minimal level of objective justification." That is to say, that aggre-

gate of events, viewed through the prism of Officer Abel's extensive professional experience, translated events which, to the non-professional observer, might merely have piqued interest and curiosity, into a ground for supposing that there was some reasonable likelihood that crime "may be afoot."

■ And so I conclude that Officer Abel and the colleagues whom he enlisted were warranted in stopping the BMW. As I have explained, there is a sharp difference between the Government and the defense as to whether there was a gun in plain view. It would appear to be common ground that if a weapon was in plain view, the officers were entitled to search for that weapon and to examine other parts of the vehicle that were available to immediate access. And incident to such a search, the officers would also, of course, be authorized to search the driver and the passenger, as they did.

The defense contention that the gun—not the Magnum, but the other weapon—was not in plain view rests on two arguments. The first is that Mr. Pearson realized that the car in which he was riding was being stopped, and that since he had approximately 30 seconds before officers would be upon him he would have done something better to conceal the weapon than to place it between his legs. He would have placed it under his seat.

The second branch of the argument is that the Bensalem report said that the weapon was under the passenger's seat. On this basis, I am asked to disregard the direct testimony of Officers Abel and Kane as to what they saw. I am not persuaded. With respect to the written report, there is room for ambiguity as to what the writer of the report may have meant about a weapon being under the passenger's seat. There is some room for proliferation of miscommunication in the reporting by one officer of what another officer told him about as hurried a sequence of events as these that are at issue here.

Accordingly, I conclude that the search of the automobile, and of Messrs. Hawkins and Pearson, was a legitimate search based on a finding that there was a gun in plain view. That determination of law, together with the determination of law that the stopping of the BMW was warranted under *Sokolow* and *Terry*, means that the motion to suppress these seized articles will be denied.

I want to make it abundantly clear that in so holding, I am not making any determination about whether, if the weapon had not been in plain view, a search of the car and its occupants would have been permissible if, and only if, Messrs. Hawkins and Pearson agreed to the search. I might note here, by way of footnote, that the car in question belonged not to Mr. Hawkins, but to his aunt, and was returned to her a few days later. But I expressly reserve that question, which is not presented on my view of this record, and I reserve that question, bearing in mind that Officer Abel's testimony that it was his expectation that he would stop the car and then ask Messrs. Hawkins and Pearson whether they assented to a search, and would have let them go on their way if they said no. The view I take of the course of events makes it unnecessary for me to reach the question whether Officer Abel's view of the constraints that he would then be operating under was properly taken.

Accordingly, for the reasons that I have announced, I am denying the motion to suppress the physical evidence taken on August 21, 1989.