896 F.Supp. 450 (1995)
UNITED STATES of America
v.
Michael ROTHBERG.
Crim. A. No. 95-00063.
United States District Court, E.D. Pennsylvania.
August 14, 1995.
*451 Frank J. Marcone, Media, PA, for Michael Rothberg.
Karl K. Lunkenheimer, U.S. Attorney's Office, Philadelphia, PA, for U.S.

*452 MEMORANDUM
LUDWIG, District Judge.
Following a jury verdict of guilty, defendant Michael Rothberg moves for judgment of acquittal or for a new trial. Fed. R.Crim.P. 29, 33.[1]
On February 1, 1995 defendant was indicted for destruction of property by means of fire, 18 U.S.C. § 844, and conspiracy to commit mail fraud, 18 U.S.C. § 371. The specific charge was that on February 3, 1990 he conspired to set fire to "Pearl's," an after-hours club located in center-city Philadelphia, in order to obtain insurance money. The club was "owned" by defendant and was managed, at the time, by Charles Supplee.[2] The government's theory was that defendant offered to pay Supplee to set the building on fire  the fire insurance policy covering the club having been re-issued, at defendant's request, in the name of his grandmother. Defendant had assigned the club's assets to his grandmother as security for a loan. Supplee, after two juries failed to reach a verdict in his case, was convicted of the arson. He did not testify at defendant's trial.
Defendant maintained that there was no credible evidence linking him to the fire and that it probably was the handiwork of two vindictive former employees. He did not contest the intentional origin of the fire, which had been ignited by using Duraflame logs.

I.
There was substantial evidence to support the guilty verdict. Much, although not all of the government's evidence, was indirect. The club had been experiencing financial difficulties; there were citation problems with the Liquor Control Board; and the property owner had demanded a large increase in rent. Trial, 3/29/95, n.t. 182, 202-203; Trial, 3/28/95, n.t. 27-28, 92. Weeks before the fire, defendant raised the fire insurance coverage from $150,000 to $250,000 having had the contents inventoried the summer before. Trial, 3/28/95, n.t. 134, 198-99.
Some months beforehand, defendant had spoken about the possibility of a fire in a conversation with a former club manager. Id. at 137. In the presence of his now estranged wife, he also discussed the same subject with his attorney. Trial, 3/29/95, n.t. 222-26.
Late on the night of the fire, defendant had the club's locks changed and made certain that Supplee had the only copies of the key. Trial, 3/28/95, n.t. 220. Supplee was the last person known to be present after the club closed, the fire having been started at about six a.m. Id. at 78-89, 221; Trial, 3/27/95, n.t. 78. About a month thereafter, Supplee informed a friend of his that he had set the fire.[3] Trial, 3/29/95, n.t. 169-71. After the fire, defendant avoided law enforcement investigators and advised the club's employees not to talk to the police. Id. at 229-230, 232-233.

II.
At trial defendant objected to Supplee's alleged admission. He again argues that reception "of [this] testimony which included a hearsay declaration of an out of court witness was clear error." Motion at 1.
That portion of Supplee's declaration that was received qualified under the hearsay exception as an admission against penal interest under Fed.R.Evid. 804(b)(3). Under this *453 Rule, such statements are not excluded as hearsay if the declarant is unavailable to testify:
statement[s] which ... at the time of [their] making ... so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement[s] unless believing [them] to be true.
Fed.R.Evid. 804(b)(3). Here, the statement was against Supplee's penal interest and was made under circumstances suggesting trust-worthiness.
As explained in Williamson v. United States, ___ U.S. ___, ___-___, 114 S.Ct. 2431, 2434-35, 129 L.Ed.2d 476 (1994), Rule 804(b)(3) permits only those declarations that are self-inculpatory. "[C]ollateral statements [including those collateral to a self-inculpatory statement] ... that are not in any way against the declarant's interest" are not admissible. Williamson, ___ U.S. at ___, 114 S.Ct. at 2435. Only that part of Supplee's declaration that concerns his having started the fire was received. Trial, 3/29/95, n.t. 157. Because it is "genuinely self-inculpatory ... it itself is one of the `particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." Williamson, ___ U.S. at ___, 114 S.Ct. at 2437. The part of the statement implicating defendant, including the promise to pay Supplee $60,000 from the insurance proceeds, was excluded because it was non-self-inculpatory. Id.
Citing Williamson, defendant asserts that before the statement was received, the government should have "produc[ed] independent evidence ... of the existence of the conspiracy." Motion at 7. In particular, defendant argues, Williamson made the predicate determination that there was separate evidence which ... tied [the declarant and the defendant] ... together as coconspirators before the hearsay declaration was entered against [defendant]." Id. at 4. While the Williamson facts demonstrated that a conspiracy existed, the Supreme Court did not require proof of its existence before implementing Rule 804(b)(3).[4] Here, Supplee's declaration connected him to the conspiracy; and other evidence of the conspiracy had previously been introduced.

III.
Prosecutorial misconduct is assigned involving a number of trial matters. While there is merit to a few of these contentions, taken together and considered carefully, they did not deprive defendant of a fair trial. Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (citations omitted) (defendant entitled "to a fair trial, not a perfect one").

A.
"[The] government erred in arguing to the jury [in closing argument] that the Defendant [in the opening statement] had promised to put on evidence and had failed to do so," which was an attempt "to place the defendant's silence or failure to testify before the jury." Motion at 11, 12.
The defendant's opening statement invited the prosecutor's comments, which at worst were only a remote reference to defendant's not testifying. The prosecutor first noted that the sole burden of proof is on the government. Trial, 3/30/95, n.t. 122. He went on to say, "when the defense suggests  or tells you  they're going to prove something or makes suggestions to you about the evidence, you should certainly use your common sense and intelligence to examine that." Id. at 123. At defendant's request an instruction was given not to infer that defendant was obligated to present any evidence. See United States v. Thame, 846 F.2d 200, 204 (3d Cir.1988) (as to curative instruction, if defense believed a more specific admonition *454 was necessary, it should have been requested).[5]

B.
It was improper for the prosecutor to refer to a fire in a hotel owned by defendant's father. During the testimony of a government witness, in response to her volunteering that defendant's father had once owned a hotel, the prosecutor asked whether the hotel had "burned down." Defendant objected as the witness responded, "I don't know." Trial, 3/29/95, n.t. 54. The objection was sustained. Id.[6]
Here, no request was made for a curative instruction, and no instruction was given. While this type of prosecutorial misconduct cannot be condoned, it did not play a major part in the trial. At times both counsel became contentious and abrasive and had to be verbally "separated" and admonished.

C.
Defendant's contention that the government presented the testimony of his now estranged wife, Yvonne Rothberg, to the grand jury knowing her to be an untruthful witness is unfounded. Motion at 16. At the time of her grand jury appearance, November 24, 1992, the Rothbergs were still living together. She testified that defendant learned of the fire early in the morning, but stayed at home for the entire day. Trial, 3/30/95, n.t. 4-5. At trial, she stated that while he did not immediately go to the fire, she fell asleep and when she woke up he was gone. Trial, 3/29/95, n.t. 235-36. This discrepancy, the only one noted by defendant, is hardly enough to categorize her as an "untruthful witness."
Moreover, Yvonne Rothberg did not testify before the grand jury that indicted defendant in 1995. What resulted from the 1992 grand jury proceeding is not in the record. Even if there were some basis for the claim, defendant now stands convicted. A "petit jury's guilty verdict render[s] any prosecutorial misconduct before the indicting grand jury harmless." United States v. Console, 13 F.3d 641, 672 (3d Cir.1993) (citing United States v. Mechanik, 475 U.S. 66, 70-72, 106 S.Ct. 938, 941-43, 89 L.Ed.2d 50 (1986)).

D.
Defendant asserts that his alleged conversation with his attorney about the possibility of a fire at the club was subject to attorney-client privilege.[7] Motion at 18.
"The attorney-client privilege protects the confidences exchanged between an attorney and a client. It gives the client the right to object to disclosure of any privileged communications made during the relationship." United States v. Inigo, 925 F.2d 641, 656 (3rd Cir.1991).[8] Nevertheless, the attorney-client privilege "`ceas[es] to operate at a certain point, namely, where the desired advice refers *455 ... to future wrongdoing.'" United States v. Zolin, 491 U.S. 554, 562, 563, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989) (quoting 8 Wigmore, Evidence § 2298 (McNaughton rev.1961)) (emphasis in original). The purpose of the crime-fraud exception is to assure that the "`seal of secrecy' ... between lawyer and client does not extend to communications `made for the purpose of getting advice for the commission of a fraud' or crime." Zolin, 491 U.S. at 563, 109 S.Ct. at 2626, (citations omitted).
Here, his wife testified, defendant sought his counsel's advice "so he wouldn't be legally responsible for the bills and involving himself in the fire," should the club be burned down. Trial, 3/29/95, n.t. 224. Inferentially, defendant elicited this information in order to facilitate the commission of arson and insurance fraud. Communications made between attorney and client for such purpose are palpably not privileged. Inigo, 925 F.2d at 656.
According to defendant, an in camera hearing should have been held before making this evidentiary ruling. Motion at 19. His argument is that because it was made at side bar, based on a proffer, the opportunity to cross-examine the witness effectively before the jury was frustrated. This objection, which was not made at trial, is rejected.

E.
Theresa Day, who became defendant's close friend and companion sometime after the fire, was called as a government witness without prior notice. On the witness stand, she broke down and cried. This witness sustained a brain injury in 1988 and apparently continues to be disabled. Trial, 3/29/95, n.t. 57-58. Noting the government's knowledge of her condition, defendant claims that the government's trial tactics were prejudicial  including the comment in closing argument that she was "acting" when she broke down during her testimony. Motion at 21. No objection to the calling of her as a witness or to the government's remarks was made at trial.[9]

F.
The Philadelphia assistant fire marshall testified that he was "leery" of speaking to defendant. Trial, 3/27/95, n.t. 117. In defendant's view, this statement conveyed the idea that he may have threatened the witness. Also, it could have been interpreted to mean "that the Defendant had acquired an attorney and the Government thereafter [improperly] used the fact the Defendant had acquired the services of an attorney as an `admission of guilt.'" Motion at 23. What occurred, however, was that the government immediately ceased direct examination of the witness and asked for a side bar conference. Trial, 3/27/95, n.t. 117. As a result of that discussion, no evidence was offered that defendant had retained counsel. On cross-examination, the witness testified that defendant had given him a statement, which should have attenuated any prejudice arising from the word "leery." Trial, 3/28/95, n.t. 4-5. There was no evidence that the witness had been threatened.

G.
The government presented evidence that five years after the fire defendant was residing in Florida with his grandmother, under the name John Morton. This evidence was offered to show the close connection to defendant's grandmother who was the named *456 insured on the club's fire insurance policy; the mail fraud involving insurance settlement proceeds of $130,000; and defendant's use of an alias. Response at 26-27. According to defendant, the government's purpose was to force him to testify on rebuttal. However, at trial defendant did not object to the evidence that he was living in Florida with his grandmother, Ms. Day, and her daughter. Trial, 3/29/95, n.t. 36. At trial, defendant objected to the testimony that he was using another name on the ground that five years after the fire such evidence had no relevance. This objection was overruled. Trial, 3/29/95, n.t. 33-34, 46.
Evidence of the use of an alias may be relevant as proof of consciousness of guilt. United States v. Stowell, 947 F.2d 1251 (5th Cir.1991) (alias relevant even though defendant did not exclude agents from room at time of arrest or continue to conceal identity after arrest). See also Williamson v. Jones, 936 F.2d 1000 (8th Cir.1991) (attempted concealment may be considered as evidence of consciousness of guilt); United States v. Tracy, 989 F.2d 1279 (1st Cir.1993) (defendant's flight and attempt to conceal identity admissible to show evidence of guilt if "`there is an adequate factual predicate creating an inference of guilt of the crime charged'").[10] Here, it was not improper for the government to argue that defendant's use of an alias or his conduct was evidence of consciousness of guilt. No instruction on this issue was given.
NOTES
[1] On July 27, 1995 he was sentenced to 27 months, a fine of $50,000, and restitution of $590,349.
[2] "Pearl's" apparently was the fictitious name in business of an entity sometimes known in Pennsylvania as a "one-man club." While a club ordinarily is owned by its members and operated for their benefit, the "one-man club" is controlled by the lessor of the space, fixtures, and tangible personal property used by the club. Such organizations have been the recipients of club liquor licenses issued by the Pennsylvania Liquor Control Board. A club licensee is permitted to serve its members after the usual closing hours required of retail establishments.
[3] Supplee's unredacted statement as proffered by the government was that he "had set the fire to the club, that Michael was going to pay him $60,000 from the insurance money for setting the fire, that he had taken money out of the video poker machines, although Michael didn't know he was going to do that." Trial, 3/29/95, n.t. 135-36. See infra at section II.
[4] Under Rule 801(d)(2)(E), exempting from the hearsay rule "a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy ... the trial court must determine, by a preponderance of the evidence, that there was a conspiracy between the declarant and the party against whom the evidence is offered." United States v. Gambino, 926 F.2d 1355, 1360 (3d Cir.1991). Here, the statement was not made in furtherance of the conspiracy and was not offered under Rule 801(d)(2)(E).
[5] Also, improper prosecutorial remarks are subject to harmless error doctrine. See United States v. Hasting, 461 U.S. 499, 510-512, 103 S.Ct. 1974, 1981-82, 76 L.Ed.2d 96 (1983) (improper comment on defendant's silence at trial violated Fifth Amendment but was harmless error); United States v. Denardi, 892 F.2d 269, 270 (3d Cir.1989) (prosecutor's reference to lack of evidence produced by defendant harmless error where more than enough evidence to support guilty verdict).
[6] "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). "A conviction will be reversed `only in those situations in which prejudice inures to the defendant from the challenged improprieties'" United States v. Adams, 759 F.2d 1099, 1111 (3d Cir.1985) (citing United States v. Somers, 496 F.2d 723, 737 (3d Cir. 1974)). Where a prosecutor's remarks, in the context of the entire trial, "were either trivial or could have been blunted by a curative instruction that [movant] ... did not request," no prejudice exists. Id.
[7] Yvonne Rothberg testified that this conversation took place in her presence. Because of spousal confidentiality, it was ruled that there was no third-party waiver. Trial, 3/29/95, n.t. 206-07. The attorney involved is deceased.
[8] Federal common law governs criminal cases. Fed.R.Evid. 501 advisory committee's note. In particular, the attorney-client privilege is "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501.
[9] In 1991, the government excused Theresa Day from testifying before the grand jury because of "cognitive and emotional deficiencies" resulting from a car accident in August 1988. Motion at 21. This information was not brought out at trial.

In summation, the prosecutor suggested her reaction on the witness stand was that of an "actress"  that a woman capable of "flying to New York to do a radio show" is capable of testifying at a trial. Trial, 3/30/95, n.t. 120. She had testified that defendant had a radio show "out of New York" and that after his arrest, she broadcast his last show for him. She also stated that "we did radio in Orlando." Trial, 3/29/95, n.t. 53-55; response at 22. In defendant's motion there is a proffer that the witness did the radio show by telephone, and it is contended that the prosecutor's closing argument that she went to New York was "gross misconduct." Motion at 22.
The inference drawn by the prosecutor from the witness's testimony was not unreasonable. No curative instruction was requested. The issue of prejudice was not raised at trial.
[10] Here, before evidence of defendant's alias was offered, other evidence of defendant's guilt had been produced.