IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 22, 2025 Session

## STATE OF TENNESSEE v. TYLAR SCOTT JOHNSON

**Appeal from the Criminal Court for Knox County**
**No. 120345    Steven W. Sword, Judge**

_____

**No. E2024-00743-CCA-R3-CD**

_____

A Knox County jury convicted the Defendant, Tylar Scott Johnson, of four counts of rape and one count of aggravated kidnapping, for which he received an effective sentence of thirty-six years in confinement at a one hundred-percent service rate. On appeal, the Defendant contends the evidence presented at trial was insufficient to support his convictions, that improper argument by the State affected the verdict, and that the trial court erred in imposing consecutive sentencing. After review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., and CAMILLE R. MCMULLEN, P.J., joined.

Robert W. White, Maryville, Tennessee (at motion for new trial and on appeal) and Daniel Morrell and Dominic Garduño, Knoxville, Tennessee (at trial), for the appellant, Tylar Scott Johnson.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Charme P. Allen, District Attorney General; and Joanie Stewart and Sean Roberts, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY

On the evening of January 30, 2021, the victim, a nineteen-year-old freshman at the University of Tennessee at Knoxville ("UT"), was preparing to go to a party with several friends, including Sydney Widic. Before leaving for the party, the friends consumed alcohol in one of their dorm rooms, and the victim "was drinking a lot" and acting "wild."

They took an Uber to the party, which was in the Fort Sanders neighborhood ("The Fort") near campus. However, a short time after arriving at the party, the victim told Ms. Widic that she wanted to leave. Because the victim had previously left parties on her own, Ms. Widic assumed the victim would take an Uber back to her dorm.

Ava Fitzgerald, a freshman at UT and the victim's friend since kindergarten, received a FaceTime call from the victim at approximately 10:30 p.m. The victim asked Ms. Fitzgerald to stay on the phone with her because she was unaccompanied by friends and was alone inside a vehicle with the person who was giving her a ride. Ms. Fitzgerald noticed that the victim was intoxicated and "couldn't keep a thought." Ms. Fitzgerald told the victim to give the phone to the driver, and the victim passed the phone to the Defendant. Ms. Fitzgerald asked the Defendant to take the victim to a nearby apartment complex where Ms. Fitzgerald would be waiting outside. The Defendant agreed, and the victim told Ms. Fitzgerald that "she was coming."

Ms. Fitzgerald waited outside the apartment complex for forty-five minutes, but the victim never arrived. Although Ms. Fitzgerald attempted to call the victim via FaceTime, the victim ended the FaceTime call and did not answer Ms. Fitzgerald's subsequent calls. Ms. Fitzgerald then began tracking the victim's phone using the Find My Friends app, which allowed the victim and her friends to track each other's locations. While waiting for the victim to arrive, Ms. Fitzgerald's phone died, and she became "very scared" that something had happened to the victim. Ms. Fitzgerald hurried to a nearby dormitory and charged her phone enough to call Ms. Widic and apprise her of the situation. Ms. Fitzgerald assumed the Defendant was an Uber driver and stated she recognized him because she and her friends had received a ride from him on Cumberland Avenue a week earlier. At that time, he introduced himself as James and refused to accept any money for driving them. However, Ms. Fitzgerald insisted on sending the Defendant money via Venmo, and upon viewing the Defendant's Venmo account, she discovered his first name was actually Tylar.

When Ms. Fitzgerald told Ms. Widic about her phone calls with the victim, Ms. Widic began calling the victim's phone but did not receive an answer, which she stated was very unusual. Ms. Widic and her friends immediately returned to their dorm room and contacted the police. Officer Travis Hamlin with the UT Police Department ("UTPD") responded to a missing persons call at South Carrick dorm on the UT campus. Upon arriving at the dorm, Officer Hamlin spoke with several individuals who were tracking the victim's location via the Find My Friends app. Officer Hamlin observed the victim's location on the app for approximately forty-five minutes up until the victim's phone returned to The Fort. At that time, Officer Hamlin left the dorm and drove to the last known location of the victim's phone where he observed the Defendant's vehicle pulled over by other officers. As Officer Hamlin approached the vehicle, he saw the victim exiting from the passenger side. The victim was "a little unsteady on her feet" and "seemed to not really

know what was going on." She did not have any shoes on, her pants were unbuttoned and unzipped, and her shirt was "pulled up over her chest."

During the period that the victim was unreachable, Emily Isaacs, another UT freshman and friend of the victim's, had come back to her dorm room with four friends. One of Ms. Isaacs' friends noticed that she had a missed call from the victim earlier in the evening. Because Ms. Isaacs had not heard from the victim that night, she opened the Find My Friends app to find the victim's location. The app showed that the victim's phone was in Blaine, Tennessee in Grainger County, approximately thirty minutes away from campus. Ms. Isaacs knew that the victim was supposed to be headed back to her dorm from the party and should not have been in Grainger County. The victim's mother, who had been informed of the circumstances by another of the victim's friends, called Ms. Isaacs and instructed her to contact the police. Before calling 911, Ms. Isaacs and her friends planned to drive to where the victim's phone was located. However, once they placed the call, the 911 operator instructed them to pull into a nearby Pilot gas station and wait for the police to arrive.

Officer Delsean Griffith, previously with the Knoxville Police Department ("KPD"), responded to the Pilot gas station on Cumberland Avenue regarding a missing persons call. There, Officer Griffith spoke with the victim's friends who provided the victim's phone location through a location sharing app. Officer Griffith shared the locations of the pings from the victim's phone with KPD and UTPD officers investigating the victim's disappearance. After the victim was located in the Defendant's vehicle, Officer Griffith drove to that location to check on the victim's safety. Upon first observing the victim, Officer Griffith noticed she was "very disheveled" and "very intoxicated." According to Officer Griffith, "[i]t seemed like [the victim] had a, kind of, mental fog, didn't really know where she was or what was going on at that point." The victim's speech was slurred, she could not answer Officer Griffith's questions clearly, and she repeated the same thing over and over. The victim also appeared to be fixated on the flashing lights of the patrol vehicles.

Officer Conner Cox, previously with the KPD, also responded to the Pilot gas station shortly after Ms. Isaacs' 911 call. Because there were already several officers gathering the victim's cell phone location data from the victim's friends, Officer Cox began patrolling The Fort. At 12:20 a.m., when he turned onto Highland Avenue, Officer Cox observed a vehicle pulling onto the street without its headlights on and then traveling a short distance before its lights were activated. The vehicle's license plate indicated it was registered in Grainger County, where Officer Cox knew the victim's phone had pinged, and therefore, he began following the vehicle. When the vehicle ran over a curb as it was making a turn, Officer Cox initiated a traffic stop and approached the Defendant, who was sitting in the driver's seat. When Officer Cox asked the Defendant what he was doing, the

Defendant responded that the victim had asked him for a ride and told him that she was "going to Mattie's house." The Defendant believed that the victim had "come from a party or something." He described that she "was just walking in the rain . . . stumbling all over the road" and that he had "almost hit her." The Defendant stated that, once the victim was inside his vehicle, she began "trying to kiss [him] . . . all over and stuff." The Defendant admitted driving the victim to Mascot, Tennessee, which is situated within Knox County, but he stated that the victim was directing him on where to go. The Defendant told Officer Cox that the victim was fine one minute and "then she'd try to like fall asleep on [him]" the next. The Defendant also told Officer Cox that the victim opened her door and tried to get out of his vehicle at a stop sign. However, the Defendant would not let her out of the car because she was drunk, and it was raining and he thought she might get hit "or something."

Officer Nicholas Adams, previously with the KPD, responded to the 911 call involving the victim and began canvassing The Fort. After the Defendant's vehicle was pulled over, Officer Adams participated in the traffic stop and observed the victim sitting in the passenger seat. Although it was sleeting outside, the victim did not appear to notice that she was not wearing shoes or that her pants were unzipped and her shirt was pulled up. Officer Adams attempted to ask the victim where she had been and what happened. However, the victim "appeared very intoxicated" and was unable to comprehend his questions. Officer Adams asked the victim if anyone had touched her in a sexual manner that was unwelcomed, and the victim responded, "I don't know who they were, but they were touching me." A short time later, Officer Adams asked the victim again, "Did the dude that you were with touch you at all?" The victim responded, "No, my brother was with me." Throughout Officer Adams' questions, the victim insisted that she was with her brother all night and continually pointed him out on the sidewalk, as he had arrived on the scene by that time. The victim told officers that she did not want to go to the hospital; therefore, she was released into the custody of her brother.

The victim's sister, who was fifteen years old and living in Franklin, Tennessee with her parents at the time, learned that the victim was missing when her parents received a phone call from one of the victim's friends. The victim's sister immediately began calling the victim's phone but did not receive an answer. Because the family's phones were connected via the Find My iPhone app, the victim's sister was able to "ping" the victim's phone remotely, causing the victim's phone to emit an "obnoxiously loud noise." The victim's sister began pushing the button to ping the victim's phone repeatedly, alternating between calling the victim and "pinging" her phone. Approximately one hour later, a man with a "thick southern accent" answered the victim's phone and told the victim's sister that his name was James. He then told the victim's sister that the victim was "walking along the sidewalk and he wanted to be a friend and help her out."

- 4 -

The victim's sister also called Katherine Hayes, a family friend who was a senior at UT. She asked Ms. Hayes to find the victim's brother, who was also a student at UT at the time. After receiving the call from the victim's sister, Ms. Hayes opened the Find My Friends app and attempted to locate the victim. Ms. Hayes noticed the victim's phone was located only two minutes from Ms. Hayes, and when she arrived at that location, Ms. Hayes saw a car pulled over by police. Ms. Hayes approached the passenger side of the vehicle and observed the victim with her "shirt pulled up and her pants unzipped." The victim seemed unaware that her clothing was askew and "had no idea what was going on." After speaking with the police, Ms. Hayes and the victim's brother took the victim to the victim's brother's apartment, where the victim immediately fell asleep.

The victim's mother received a telephone call from one of the victim's friends stating that the victim was trying to get in touch with her friends, and when they checked her location, she was far away from campus. The victim's mother knew the victim should have been on campus and told the victim's friends to contact the police. After the victim had been found with the Defendant, the victim's mother called the victim via FaceTime while the victim was still at the scene. However, the victim appeared "totally impaired" and "not herself." The victim was not making any sense and was continually focusing on her brother, telling her mother that she and her brother were "okay." However, "[t]here was something about [the victim's] tone that [her mother] knew was not right." After speaking with the victim, the victim's mother and father immediately drove to Knoxville from Franklin and arrived at approximately 4:00 a.m. The victim was sleeping, and the victim's mother woke her up and took her to the hospital for an examination.

Erin Talbot, an expert in forensic nursing and a sexual assault nurse examiner at the Sexual Assault Center of East Tennessee, performed a medical examination on the victim at 6:25 a.m. on January 31, 2021. Prior to the examination, the victim provided a history of the assault, a report of which was read into the record:

> Nineteen-year-old white female reports she went to a house party in Knoxville, Tennessee, and she does not remember anything at all that happened after that.

Ms. Talbot's forensic nursing narrative, which was written by Ms. Talbot after extrapolating the details given to her by the victim, was also read into the record:

> Called to UT Medical Center for 19-year-old white female who reports she may have been sexually assaulted. Victim states she was hanging out with her friends, Katherine Fultz and Madison Hodge, in their dorm, South Carrick, on UT campus. Victim states they were hanging out around 7 p.m., on 1-30-21, and she took two shots of alcohol, Tito's vodka.

Victim states they left their dorm and went to house party in [T]he Fort, in Knoxville, Tennessee. Victim states she remembers walking into the party but does not remember anything else from that point forward. Victim states there were a lot of other people at the party, but the only person she remembers seeing that she knew, other than the two friends mentioned above, was her friend Sydney Widic.

Victim states she thinks it was around 8:30 or 9:00 p.m. that they took an Uber and arrived at the party. Victim states she does not remember anything at all that happened from the time she walked into the party until waking up at her brother's apartment and her mom being there to pick her up.

Victim states her friends told her, at one point in the night, she was in Blaine, Tennessee, and then back in Knoxville, Tennessee. The victim states she does not know where she was or who she was with and that she must have been blacked out all night, so unsure if she was, maybe, drugged. Victim states it was probably around 3 to 4 a.m., on 1-31-21, when she woke up at her brother's apartment, The Standard, in Knoxville.

Evidence kit and toxicology kit obtained per patient request. Medications given per protocol and the CDC standards. Victim was discharged back to the hospital staff.

According to Ms. Talbot, the victim was "willing and very able" to answer her questions and did not appear evasive in any way. During the victim's pelvic exam, Ms. Talbot reported that she did not find any visible injuries and explained that this is not uncommon and occurs in "probably more than 70 percent of sexual assault cases." However, she agreed that it would not be unusual for someone to report pain or soreness hours or days after an exam. Ms. Talbot also collected oral swabs, vulvar swabs, and vaginal swabs.

Sergeant Brandon Wardlaw with the KPD was notified of the victim's case after she was found in the Defendant's vehicle. However, officers informed Sgt. Wardlaw that he "probably [would not] be able to get much information from the victim" that evening due to her condition. Therefore, Sgt. Wardlaw chose to wait and speak with the victim on February 2. However, during his interview with the victim, she was unable to identify the Defendant or provide the details of where she was on the night she was missing. Following his interview with the victim, Sgt. Wardlaw spoke with Ms. Fitzgerald who informed him that she saw the driver of the vehicle during her FaceTime call with the victim. Sgt.

Wardlaw then prepared a photographic lineup from which Ms. Fitzgerald was able to identify the Defendant.

Sgt. Wardlaw received consent from the victim to perform a search of her cell phone, and a physical extraction of the victim's cell phone was performed related to the timeframe of January 30, 2021, at 4:48 p.m. until January 31, 2021, at 12:29 a.m. Between 10:23 p.m. and 10:32 p.m., the victim initiated four FaceTime calls to Ms. Fitzgerald. The final call lasted five minutes and eighteen seconds. Following this call, the victim did not answer any incoming calls, which included approximately 150 phone calls, FaceTime calls, and voicemails. Sgt. Wardlaw also analyzed the device locations of the victim's cell phone from this timeframe.

In June 2021, the Defendant gave a statement to police in which he told Sgt. Wardlaw that he met the victim at a party. According to the Defendant, they began talking, and the victim stated that she wanted to "hang out for a little bit" so they began driving toward the Defendant's house. While the Defendant was driving, the victim began kissing him and jumped in his lap. The Defendant stated that the victim, who was "drunk," was laughing and giggling and never asked the Defendant to take her to a friend's house. Approximately halfway to the Defendant's house, the victim began performing oral sex on the Defendant, so he pulled over on the side of the road. The victim then "jumped [in the Defendant's] lap," and they had consensual sex. The Defendant told Sgt. Wardlaw that he did not use protection, and when asked if he ejaculated inside of the victim, the Defendant stated, "I don't think I'm not going to pull out so . . . ." Afterward, the victim put her clothes back on, and the Defendant drove back to Knoxville. On the way, the victim was "nodding out a little bit" because "the alcohol was getting really to her." Sgt. Wardlaw asked the Defendant if he could "download" the Defendant's cell phone to get his "whereabouts," but the Defendant refused to consent to a search of his phone. Following his interview with the Defendant, Sgt. Wardlaw attempted to subpoena the Defendant's phone records. However, he learned that the phone number provided by the Defendant had been activated after the incident occurred.

Special Agent Kim Lowe, an expert in forensic biology and DNA analysis with the Tennessee Bureau of Investigation ("TBI"), received the victim's rape kit, which included vaginal, vulvar, and oral swabs, as well as the victim's underwear. Also, in July 2021, the TBI received a buccal sample from the Defendant from which Special Agent Lowe extracted a DNA profile. Special Agent Lowe analyzed the vaginal swabs, vulvar swabs, and oral swabs and found the presence of male DNA, but the victim's underwear did not indicate the presence of semen. Special Agent Lowe compared the DNA profile obtained from the vaginal sample with the Defendant's, and she opined that the profile from the vaginal swabs matched the standard from the Defendant.

- 7 -

Special Agent Melanie Carlisle, an expert in forensic science regarding alcohol and toxicology with the TBI, analyzed the victim's blood sample, which was taken at 7:30 a.m. on January 31, 2021, for the presence of alcohol. Special Agent Carlisle testified that the victim's blood alcohol content was 0.173-gram percent and opined that the victim would have likely had a change in mood, affected balance, slurred speech, and drowsiness. Special Agent Carlisle also testified that memory disturbances and loss of critical judgments were possible. Because the victim's blood sample was taken several hours after she stopped drinking alcohol, Special Agent Carlisle opined that the victim's alcohol level at 10:30 p.m. would have been approximately .22- to .27-gram percent.

Special Agent Jonathan Thompson, an expert in forensic toxicology with TBI, analyzed the victim's blood sample for multiple different classes of drugs. The victim tested positive for Citalopram, an antidepressant and anxiety medication, at less than 0.05 micrograms per milliliter. Special Agent Thompson opined that, because both alcohol and antidepressants are central nervous system depressants, Citalopram can increase the side effects of alcohol.

The victim testified that she had recently begun taking Lexapro, an anxiety medication, a month before this incident. On January 30, 2021, the day of the incident, the victim remembered going to lunch with friends and working on schoolwork before getting ready for the party. She and several friends were in her friend's dorm room "drinking and hanging out," and the victim recalled having "at least two or three shots of vodka." Afterward, the victim and Ms. Widic took an Uber to the party, and the victim recalled being in the kitchen of the house. However, the last thing the victim could recall was standing outside the house with her friend Molly until later when she saw the flashing blue lights from the patrol vehicles. When the victim's parents woke her up at her brother's apartment the next morning, the victim was very confused and did not understand what had happened. In the days following the incident, the victim's breasts and vaginal area were "very sore." According to the victim, she had never seen the Defendant before that night and did not remember being in his vehicle with him.

The Defendant declined to present evidence. Following deliberations, the jury convicted the Defendant of four counts of rape and one count of aggravated kidnapping.

During the sentencing hearing, the State introduced a copy of the Defendant's presentence report. Detective Dylan Williams with KPD testified that he obtained a search warrant to perform an extraction of the cell phone seized from the Defendant. Following the extraction, Det. Williams reviewed the text messages contained on the Defendant's phone, including a series of messages with someone claiming to be a fifteen-year-old girl. Throughout the messages, the Defendant asked the girl if she was a virgin, if she was "into

cuddling," and if she ever thought about having sex. The Defendant also asked the girl to send him nude photographs, requesting something "nice and sexy."

Investigator Alexia Stevenson with the UTPD testified that she was involved in the investigation into the victim's disappearance. After the victim was located, Investigator Stevenson responded to the scene and ran the Defendant's information. She learned the Defendant was "trespassed" from UT in 2018 after he asked several women near Sorority Village to get into his vehicle. Investigator Stevenson stated that she issued an additional notice of trespass to the Defendant following the incident with the victim, making it "abundantly clear that [the Defendant] was not welcome back on the University of Tennessee property at any time, for any reason and that it last[ed] indefinitely."

Corporal Jason Dean, a patrol supervisor for Carson Newman University in Jefferson City, Tennessee, testified that in August 2021, he was notified that a female student was approached by a male in a vehicle who offered to pay her $300 to have sex with him. After beginning an investigation, Corporal Dean identified several other women who stated that similar incidents had happened to them. A witness also approached Corporal Dean and stated that she saw the message regarding the incidents on the university's safety app and recognized the suspect as the Defendant. Corporal Dean prepared a photographic lineup from which the victims were able to identify the Defendant. The Defendant was then banned from all Carson Newman University property, and charges were filed against him for patronizing prostitution in Jefferson County.

Emeral Overholt testified that, late one night in September 2021, she was in her apartment with two friends when she heard a knock on her door. She opened the door without hesitation, thinking another friend had arrived. However, the Defendant, who Ms. Overholt did not know, was standing on her threshold and asked her if this was the Smith residence. She responded that it was not, but the Defendant was insistent that he was at the Smiths's apartment. As he spoke to Ms. Overholt, the Defendant, whose eyes were "deadpan, lifeless," began "getting a little closer to the door," and Ms. Overholt became "a little [wary]." Ms. Overholt began to shut her door, but the Defendant continued to talk to her, asking if he could use her phone. She told him no, and he asked if he could have her phone number. The Defendant then reached in his pocket, pulled out four $100 bills, and asked Ms. Overholt if that "change[d] [her] answer." At that point, Ms. Overholt's friend asked what was happening, and the Defendant stepped back, giving Ms. Overholt a chance to shut the door. After filing a police report, Ms. Overholt reviewed the security camera footage from her apartment complex. In the security footage, Ms. Overholt observed the Defendant's vehicle enter the apartment complex and circle her building several times before it was parked in front of the building, near her apartment. He exited his vehicle and initially approached a teenager who was walking her dog. He then returned to his vehicle

and sat inside, facing the front of Ms. Overholt's apartment, which had the blinds opened, for twenty-eight minutes before approaching her door.

Christine Morton, the Defendant's grandmother, testified that she and the Defendant have a close relationship. She would often go to the Defendant's house to watch movies and spend the night, and the Defendant was always quick to check on her if he had not heard from her in a while. Additionally, the Defendant helped to pay off Ms. Morton's car when she was experiencing financial hardship.

Vivian Gray, a friend of the Defendant's grandmother, testified that she met the Defendant when he was four years old. Although they were not related, the Defendant had always "felt like family" to Ms. Gray, and he had always been happy to help her around the house. Additionally, the Defendant often took Ms. Gray and her brother to appointments or to run errands.

Maryann Trent, the Defendant's great-aunt, testified the Defendant had "always been kind" and always included her in whatever he was doing. She had never known the Defendant to be disrespectful.

Von Kaylor, the Defendant's stepfather, testified that he met the Defendant when the Defendant was six years old. According to Mr. Kaylor, the Defendant was helpful and would often assist him with yardwork or fixing his vehicle. The Defendant would "bend over backwards to try to help somebody," even if they took advantage of him.

Caroline Wade, the Defendant's grandmother, testified that the Defendant was a "good person" who never did drugs or drank alcohol. Ms. Wade asked that the Defendant receive "mercy" so that she and the Defendant's grandfather could see him again because she "love[d] him more than life."

Melissa Kaylor, the Defendant's mother, testified that the Defendant was a "loving, giving person" who "would do anything to help anybody." She stated that the Defendant would often come after work to help her with her business. Ms. Kaylor testified that she had "seen [the Defendant] give his last dollar to help someone."

The victim, the victim's mother, the victim's father, and the victim's sister provided victim impact testimony at the hearing. The victim testified that she felt violated and "disgusting" following her rape. She stated that she slept with her mother for over a month due to the "countless nightmares" she experienced. Although she was prescribed multiple sleeping medications, the victim was often unable to sleep at night and would sleep during the daytime instead. She would "break into a panic attack and [her] body would physically shake the minute the sun went down because [she] hated seeing darkness outside." The

- 10 -

victim also stated that the Defendant robbed her of her college experience because she was forced to move home following the rape, causing her to miss the remainder of her freshman year. The victim requested that the Defendant receive the maximum sentence and be held "fully accountable for his actions."

In sentencing the Defendant, the trial court considered the evidence presented during the trial and sentencing hearing, including the presentence report and the arguments of counsel. In reviewing the enhancement factors, the trial court found the following factors applicable: (1) the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; and (7) the offense was committed to gratify the Defendant's desire for pleasure or excitement. Tenn. Code Ann. § 40-35-114(1), (7). The trial court gave great weight to enhancement factor (1) and little weight to factor (7). In mitigation, the trial court took into consideration the testimony from the Defendant's family members and the Defendant's lack of previous convictions. After weighing the applicable enhancement and mitigating factors and considering the facts and circumstances of the case, the trial court-imposed sentences of twelve years at a one hundred-percent service rate for each count of rape and kidnapping.

The trial court merged the Defendant's four rape convictions for vaginal and oral sex, which were charged in alternative ways, into a single count for each act. Regarding consecutive sentencing, the trial court found that the Defendant's behavior indicated little or no regard for human life and he had no hesitation about committing a crime in which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(4). As a result, the trial court aligned the two rape sentences consecutively with the kidnapping sentence, resulting in an effective sentence of thirty-six years in the Tennessee Department of Correction.

The Defendant filed a motion for new trial, which the trial court denied. This timely appeal followed.

## II.    ANALYSIS

On appeal, the Defendant argues that the evidence presented at trial was insufficient to support his convictions. The Defendant also contends that the State improperly commented on his Fourth Amendment right to refuse to consent to the search of his cell phone and that the trial court erred in imposing consecutive sentences. The State contends that the evidence was sufficient to support the convictions, that the State's argument regarding the Defendant's lack of consent was not improper, and that the trial court properly exercised its discretion in sentencing the Defendant.

- 11 -

## A. Sufficiency of the Evidence

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The law provides this deference to the jury's verdict because

> [t]he jury and the [t]rial [j]udge saw the witnesses face to face, heard them testify, and observed their demeanor on the stand, and were in much better position than we are, to determine the weight to be given their testimony. The 'human atmosphere of the trial and the totality of the evidence' before the court below cannot be reproduced in an appellate court, which sees only the written record[.]

*Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963) (quoting *Folk v. Folk*, 210 Tenn. 367, 376, 355 S.W.2d 634, 637 (1962)). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

### 1. Rape

The Defendant was convicted of four counts of rape. As charged in this case for counts 1 and 3, rape is the "unlawful sexual penetration of a victim by the defendant or of

the defendant by a victim" and "[t]he defendant knows or has reason to know that the victim is . . . physically helpless[.]" Tenn. Code Ann. § 39-13-503(a)(3) (Repl. 2018). As charged in counts 2 and 4, rape is "unlawful sexual penetration of a victim by the defendant or of the defendant by the victim," and "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent[.]" *Id.* § -503(a)(2) (Repl. 2018). Under both theories of rape, the term "sexual penetration" is defined as "sexual intercourse, . . . fellatio, . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7). The State elected the alleged act of vaginal intercourse for counts 1 and 2 and the alleged act of fellatio for counts 3 and 4.

"Consent is a question for the jury." *Haynes v. State*, 540 S.W.2d 277, 278 (Tenn. Crim. App. 1976) (citing *King v. State*, 357 S.W.2d 42, 46 (Tenn. 1962)). In the light most favorable to the State, the evidence established that the victim became intoxicated after drinking several vodka shots in her friend's dorm room. Ms. Widic testified the victim was "drinking a lot" and acting "wild" prior to going to a party in The Fort. After the victim left the party, the Defendant found her alone and "stumbling" on the street and persuaded her to enter his vehicle. While inside the Defendant's vehicle, the victim "couldn't keep a thought" when speaking to Ms. Fitzgerald on a FaceTime call. During this call, the Defendant told Ms. Fitzgerald that he would bring the victim to her location at a nearby apartment complex. However, instead of bringing the victim to this location, the Defendant drove the victim around for almost two hours, including driving her to a different county.

Friends and police officers who observed the victim immediately after she exited the Defendant's vehicle testified the victim was "unsteady on her feet," "did not know what was going on around her," was unaware of her state of undress despite the freezing temperatures, had slurred speech, and could not answer questions coherently. The victim testified that she had started taking an antidepressant prior to this incident. Special Agent Carlisle testified that the victim tested positive for Citalopram, an antidepressant. Additionally, Special Agent Carlisle testified that the victim's blood alcohol content was approximately .22- to .27-gram percent at the time of the rape. Special Agent Carlisle said that, because both alcohol and antidepressants are central nervous system depressants, Citalopram can increase the side effects of alcohol. Special Agent Carlisle opined that, based upon the victim's intoxication on the evening in question, the victim would have likely had a change in mood, affected balance, slurred speech, and drowsiness and that memory disturbances and loss of critical judgments were possible. The victim's intoxication left her unable to remember much of what happened after leaving her friend's dorm room that evening. The Defendant's admissions to the police, as well as DNA

evidence taken from the victim as part of her sexual assault examination, established that the Defendant had vaginal intercourse with the victim and that fellatio also occurred during this encounter. Additionally, when asked if anyone touched her in a sexual manner that was unwelcomed, the victim told officers that she did not "know who they were, but they were touching [her]." In the days that followed, the victim experienced soreness in her breast and vaginal areas.

This evidence was sufficient for a jury to conclude beyond a reasonable doubt that the Defendant unlawfully sexually penetrated the victim, that the Defendant knew or should have known that the victim did not consent to the penetration, and that the victim's intoxication rendered her physically helpless at the time of the penetration. Accordingly, the evidence was sufficient for the jury to find the Defendant guilty of two instances of rape under the alternate theories of lack of consent and a physically helpless victim. *See State v. Cochran*, No. E2023-00142-CCA-R3-CD, 2023 WL 8231866, at *6-7 (Tenn. Crim. App. Nov. 28, 2023) (concluding the evidence was sufficient for the jury to find that the victim did not consent to the sexual activity and was physically helpless at the time of the rape due to her intoxication), *no perm. app. filed*; *State v. Foster*, No. E2018-01205-CCA-R3-CD, 2019 WL 1546996, at *17 (Tenn. Crim. App. Apr. 9, 2019) (holding the evidence sufficient for finding that the victim did not consent and was physically helpless during the rape when the defendant "knew the victim was very intoxicated before he had sex with her.").

Although the Defendant advanced the theory that the sexual encounter was consensual and the victim was not so intoxicated as to be helpless, the jury rejected the Defendant's contentions, as was its prerogative. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). The Defendant is not entitled to relief on this issue.

2.      Aggravated Kidnapping

The Defendant also asserts the evidence presented at trial was insufficient to support his conviction for aggravated kidnapping. He contends that the confinement and removal of the victim did not substantially interfere with the victim's liberty and, alternatively, that the confinement was incidental to the rape.

The Defendant was convicted of one count of aggravated kidnapping. As charged in this case, "[a]ggravated kidnapping is false imprisonment . . . committed . . . to facilitate the commission of any felony[.]" Tenn. Code Ann. § 39-13-304(a)(1). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § -302(a).

The evidence in this case, when viewed in the light most favorable to the State, established that the highly intoxicated victim was picked up by the Defendant while she was alone on the street. Once in his vehicle, the victim called Ms. Fitzgerald via FaceTime and asked her to stay on the phone because the victim was alone with the Defendant in the Defendant's vehicle. Although the Defendant agreed to take the victim to Ms. Fitzgerald's location, he instead drove her around for two hours, including to areas at least thirty minutes away from UT's campus and out of Knox County, and he refused to let her out of the vehicle when she tried to open the door. The victim's sister used the Find My iPhone app to repeatedly "ping" the victim's phone, which would have caused the victim's phone to emit an "obnoxiously loud noise." The victim missed 150 phone calls from various family members and friends while the Defendant drove her around. Also, as established above, during this timeframe, the Defendant raped the victim. Accordingly, the evidence was sufficient to support the Defendant's aggravated kidnapping conviction. *See State v. King*, 703 S.W.3d 738, 759-763 (Tenn. Crim. App. 2024) (concluding the evidence was sufficient to support especially aggravated and aggravated kidnapping convictions where the defendant lured the young victim into the bedroom and locked the door to facilitate the rape and again when the defendant blocked the teenage victim's path, ordered her to the bedroom, and locked the door behind them to facilitate the rape); *State v. Duff*, No. E2013-01582-CCA-R3-CD, 2014 WL 6612578, at *6 (Tenn. Crim. App. Nov. 24, 2014) (holding the evidence sufficient to support an aggravated kidnapping conviction when the defendant prevented the victim from exiting the vehicle and prevented others from assisting the victim).

Although the Defendant argues that the victim voluntarily got into his vehicle because she wanted to spend time with him and that she did not want him to take her to meet Ms. Fitzgerald, he presented this argument at trial. Through its finding of guilt, the jury rejected his argument and accredited the State's witnesses. We will not disturb that finding on appeal. *See Bland*, 958 S.W.2d at 659.

Next, the Defendant, relying on *State v. White*, 362 S.W.3d 559 (Tenn. 2012), contends that the evidence was not sufficient to sustain his conviction because the confinement was essentially incidental to the rape. In *State v. White*, the Tennessee Supreme Court concluded that the legislature intended "to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." 362 S.W.3d 559, 577 (Tenn. 2012). Although no specific period of time of confinement or distance of removal is required, a removal or confinement "interferes substantially" with another's liberty if the time of confinement is significant or the distance of removal is considerable. *Id.* at 576-77. Accordingly, "trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support

a conviction." *Id.* at 578. Factors to consider when determining whether there is substantial interference of the victim's liberty include "the nature and duration of the victim's removal or confinement by the defendant"; "whether the removal or confinement occurred during the commission of the separate offense"; "whether the interference with the victim's liberty was inherent in the nature of the separate offense"; "whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so"; "whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective"; and "whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." *Id.* at 580-81. In order to provide guidance to trial courts, our supreme court set forth a particular jury instruction for courts to use when instructing on kidnapping offenses. *Id.*; *see also* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—CRIMINAL §§ 8.01-.03, 8.05 (26th ed. 2022). The standard of review is the same as that for reviewing the sufficiency of the evidence: whether there was any evidence, viewed in the light most favorable to the State, from which the jury could infer that the State met its burden of proof in showing that the victims' restraining was not incidental to the accompanying felonies. *Id*. at 562.

In this case, the Defendant does not dispute that the trial court properly instructed the jury as required under *White*, and he acknowledges that the victim's rape occurred "over the course of a few minutes." However, the victim was confined to the Defendant's vehicle for almost two hours. During this period of time, the Defendant drove the victim out of Knox County toward the Defendant's residence, an area she was unfamiliar with, before driving back to the UT campus. At one point, the victim attempted to get out of the Defendant's vehicle at a stop sign, but the Defendant prevented the victim from exiting his vehicle. The victim's friends and family tried to contact her repeatedly during this time, as evidence by the 150 missed phone calls. From this evidence, a reasonable juror could have concluded that the removal and confinement prevented the victim from summoning assistance, reduced the Defendant's risk of detection, and increased the victim's risk of harm, and that the confinement of the victim, therefore, was not merely incidental to the rape. Accordingly, the evidence was sufficient to sustain the Defendant's convictions for aggravated kidnapping and the contemporaneous rape. *See King*, 703 S.W.3d at 759-63 (analyzing the facts of that case under *White* and reaching the same conclusion). The Defendant is not entitled to relief on this issue.

## B. The State's Closing Argument

The Defendant argues that the State, during its rebuttal closing argument, impermissibly commented on the Defendant's exercising his constitutional right to refuse to consent to a search of his cell phone. The Defendant acknowledges he failed to contemporaneously object to the argument and requests review under the plain error

doctrine. The State maintains the Defendant is not entitled to plain error relief because substantial justice does not require consideration of any error in this case.

### 1. Relevant Facts

The following exchange occurred during Sgt. Wardlaw's testimony:

Prosecutor: Did you attempt to subpoena phone records – let me give you a number – for ***-***-**** through Verizon?

Sgt. Wardlaw: I did.

Prosecutor: Okay. Was anything produced?

Sgt. Wardlaw: No, ma'am.

Prosecutor: What was the response?

Sgt. Wardlaw: That was a new number that had been activated, I think, around March.

. . . .

Prosecutor: We had talked previously about you attempting to get phone records for an ***-***-**** through Verizon?

Sgt. Wardlaw: Yes, ma'am.

Prosecutor: And that was the number given to you by [the Defendant] that he had?

Sgt. Wardlaw: Yes, ma'am.

Prosecutor: Would that have given you cell tower information?

Sgt. Wardlaw: It would have.

Prosecutor: Okay. And the response from Verizon?

Sgt. Wardlaw: Was that was – that phone wasn't active during that time period from which – from the time period when this incident took place, that phone number was not active.

The Defendant's recorded interview with Sgt. Wardlaw was also played for the jury. Relevant to this issue, the following exchange occurred:

Sgt. Wardlaw: So, let's verify everything you're telling me that – do you mind if we download your phone? Just to verify all of this stuff?

Defendant: Download it for what?

Sgt. Wardlaw: To get the – your – your – whereabouts. Like your info where you've been. Do you – can I download your phone? Is that yes or a no? So no.

Defendant: No.

Sgt. Wardlaw: Ok, like I said, I just ask, so you said you don't want your phone downloaded. All right. Sit tight. I will be back.

During closing argument, defense counsel made the following statement:

Location? They are relying on the apps of a group of college-aged students, relayed at different times to different people. [Sgt. Wardlaw] could have got[ten] the cell phone tower records. Yeah, I can absolutely do that, track it to almost a reasonable certainty, didn't do it. 'Cause once [Sgt. Wardlaw] heard [the Defendant] say that they had sex, he's done. Rape, murder, robbery, I've got my case, because he made the determination that she was too drunk to consent.

Later, during the rebuttal closing argument, the prosecutor stated:

Location. Wanting you to talk about, well, for [the victim's] phone, you only dump the entire phone, you didn't get the cell tower location. I want to go back to [the Defendant's] phone. What does he say in that interview? He's asked, can I search your phone? No. And when they try to subpoena the records, well, the phone number that you gave [Sgt.] Wardlaw, that's a new number, isn't it? Deceit. Trickery.

## 2.    Plain Error Review

As acknowledged by the Defendant, he did not contemporaneously object to the prosecutor's comment in the State's rebuttal argument. Therefore, if he is entitled to relief at all, it would be through the avenue of plain error review. *See State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022). In conducting plain error review, our court will reverse for plain error only if the five following prerequisites are satisfied:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be present in the record before an appellate court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. *Id*. at 283. In order to warrant plain error relief, the magnitude of the error must have been so significant "that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). Plain error relief should be "sparingly exercised[,]" *see State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and is only appropriate for errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding," *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). A defendant has the burden of persuading the appellate court that plain error exists. *Bledsoe*, 226 S.W.3d at 355.

## 3.    Analysis

Although our courts in Tennessee have not directly addressed this issue in the context of closing arguments, our supreme court has noted, "There is authority that the refusal of an accused to consent to a search without a warrant may not be used against him to imply guilt." *State v. Johnson*, 743 S.W.2d 154, 159 (Tenn. 1987). This court recently held that a trial court erred by admitting evidence that the defendant refused to consent to a search of his residence. *State v. Sullivan*, No. E2022-00962-CCA-R3-CD, 2024 WL 268794, at *9 (Tenn. Crim. App. Jan. 24, 2024), *no perm. app. filed*. The Defendant in the case at bar, however, does not challenge the admission of his statement in the first instance. In fact, the record reflects that there was no pretrial motion to suppress this portion of the Defendant's statement, *see* Tenn. R. Crim. P. 12(b)(2)(C) (requiring motions to suppress evidence to be filed pretrial), nor did the Defendant object at trial to the statement's admission. As such, at first blush, the prosecutor's argument appears to be appropriate as

it was "based upon the evidence introduced at trial[.]" *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

Our inquiry does not end here, however, because *Goltz* also prohibits closing arguments that are "otherwise improper under the facts or law." *Id*. (citing *Coker*, 911 S.W.2d at 368). While *Johnson* noted authority that prohibited the use of a refusal to consent as evidence, "it allowed this type of evidence when offered for other 'relevant and admissible' purposes, such as refuting the notion that the defendant 'was cooperating voluntarily with investigating authorities.'" *Sullivan*, 2024 WL 268794, at *8 (quoting *Johnson*, 743 S.W.2d at 159). Such an approach is in line with the general principle that a prosecutor may refer to otherwise forbidden topics in order to make a "fair response" to defense counsel's claim. *United States v. Robinson*, 485 U.S. 25, 32 (1988).

During closing arguments, defense counsel criticized Sgt. Wardlaw's reliance "on the apps of a group of college-aged students." He stated that Sgt. Wardlaw "could have got the cell phone tower records" but "didn't do it[,]" thus implying a lack of thoroughness in the investigation. In this instance, we believe it was appropriate for the prosecutor to counter with evidence in the record that Sgt. Wardlaw had attempted to obtain this information directly from the Defendant, but the Defendant refused to cooperate. *See United States v. Dozal*, 173 F.3d 787, 794 (10th Cir. 1999) ("[A]sking a jury to draw adverse inferences from [a refusal to consent to a search] may be impermissible if the testimony is not admitted as a fair response to a claim by the defendant or for some other proper purpose." (citing *United States v. Thame*, 846 F.2d 200, 207 (3d Cir. 1988))). The prosecutor's argument on this point was exceedingly brief—"He's asked, can I search your phone? No."—and then the prosecutor immediately moved to the main point of this portion of the argument, that the Defendant engaged in "[d]eceit" and "[t]rickery" by providing incorrect phone numbers to Sgt. Wardlaw. Under these circumstances, the Defendant has not shown that the prosecutor breached a clear and unequivocal rule of law. *See Bledsoe*, 226 S.W.3d at 355; *Smith*, 24 S.W.3d at 282.

We also conclude that review of this issue is not necessary to do substantial justice. Even in the absence of the argument regarding the Defendant's refusal to consent to a search of his cell phone, the State introduced ample evidence of the Defendant's guilt at trial. There is little dispute that vaginal intercourse and fellatio occurred between the Defendant and the victim. The pertinent issues as to the rape counts were whether the victim was physically helpless and whether she was unable to consent during these incidents. Multiple lay, expert, and law enforcement witnesses provided proof of the victim's high level of intoxication on the night in question. This proof strongly supports the jury's conclusion that the victim was physically helpless and unable to consent to sexual activity and that she was unlawfully removed or confined to facilitate the rapes. Whether

- 20 -

the jury heard that the Defendant refused to give consent to search his phone is of little consequence under these circumstances, where the prosecutor's argument focused more on the Defendant's subterfuge in providing incorrect phone numbers to the investigator. Any reference to the Defendant's refusal to consent did not contribute to the verdict. Thus, the Defendant is not entitled to plain error relief on this issue.

## C. Consecutive Sentencing

The Defendant argues that the trial court erred in imposing consecutive sentences. Specifically, the Defendant argues "there is no[] proof in the record to suggest the behavior attributed to the [D]efendant indicated no regard for human life or that the risk to human life was high." The State contends the trial court properly imposed consecutive terms.

When an accused challenges the length of a sentence or manner of service, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the *Bise* standard to "questions related to probation or any other alternative sentence"). The *Bise* standard of review also applies to consecutive sentencing determinations. *State v. Pollard*, 432 S.W.3d 851, 860-61 (Tenn. 2013). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001).

The Sentencing Reform Act was enacted in order "to promote justice" and "assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions." Tenn. Code Ann. § 40-35-102. In determining the proper sentence, the trial court must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the Administrative Office of the Courts ("AOC") as to Tennessee sentencing practices for similar offenses; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b).

A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the categories in

Tennessee Code Annotated section 40-35-115(b). "Any one of these grounds is a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the . . . grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). Additionally, when the imposition of consecutive sentences is based upon the trial court's finding the defendant to be a dangerous offender, the court must also find "that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see also Pollard*, 432 S.W.3d at 863-64.

In determining whether to require the Defendant to serve his sentences consecutively, the trial court found the Defendant's behavior indicated little or no regard for human life and he had no hesitation about committing a crime in which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(4). In imposing consecutive sentences on the basis that the Defendant is a dangerous offender, the trial court articulated its reasons, as follows:

> [Defense counsel] makes some good arguments about that. He was not – he never caused serious bodily injury or threatened serious bodily injury. I get your argument, [defense counsel]. I do disagree with that. I believe, with the aggravated kidnapping, that, in fact, the risk to her life was greatly increased in this case. And he not only hesitated [sic] to do it, he intentionally did it. He removed her from that place so he could do with her what he did.
>
> And I do think [the prosecutor] has made some very good arguments on that about the danger to women in particular. And I think those were – were well taken by the Court, the argument that she makes. And I

adopt those arguments regarding the added risk to someone in [the victim's] situation. And so I do think that the facts of this case do show that his behavior indicated little or no regard for human life and had no hesitation about committing the offense.

And so now you turn to the *Wilkerson* factors. First, the circumstances surrounding the commission of the offense, are they aggravated? And so what you look at on that is, you try to determine, is this particular rape and [aggravated] kidnapping any worse than another rape and [aggravated] kidnapping? And, unfortunately, I believe I've tried five rape cases this year, and I don't think I've ever had a year where I've tried as many rape cases as I've tried first-degree murders. And when I think about those other cases, they were all bad, but there's not a single one of them that is anywhere close to as dangerous as this case was.

And I mention the word "predator." And what – why I think that is a good term is because I think [the Defendant] was preying on people. I think [the Defendant was] hunting.

. . . .

[T]he fact that [the victim was] intoxicated is in no way any justification for what he did. And he was looking for somebody in [the victim's] state. And so that's why I say he's a predator, because he wasn't able to find anybody until he ran into [the victim]. Unfortunately for [the victim], [she's] the person that came across his path.

And so I do believe that the fact that he took somebody in that state, put them in a car and drove them across county lines to a place this person had never been and could not have gotten help had she had the wits about her to be able to even ask for help, I do think that makes the circumstances of this case particularly aggravated compared to the other rape and aggravated kidnapping cases I've had.

Is confinement for an extended period of time necessary to protect society from the [D]efendant's unwillingness to lead a productive life and the [D]efendant's resort to criminal activity in furtherance of an antisocial lifestyle? Now, you would think that is not met, because he only has a disorderly conduct [conviction]. He hasn't been on probation. We haven't had an opportunity to observe him. But recall, there have been multiple times where the [D]efendant has encountered law enforcement for similar type of

behavior, where he's stalking women and engaging in unwelcome conduct and the police have told him, stop doing this. Stay off of UT property. Stay off of Carson Newman property. And it's just continued. And so he has continued to engage in a lifestyle that is antisocial. And so I do think the State has met that particular *Wilkerson* factor.

And then, lastly, the aggregate length of the sentences reasonably relate to the offense of which the [D]efendant stands convicted. And so that's, basically, a way of saying, you know, is it a fair and just length of a sentence, based upon all the things the Court has to consider under the guidelines of the sentencing and compared to other rape and aggravated kidnapping cases?

So all that being said, the Court does find that the State has shown that the appropriate sentence in each Count is the maximum sentence of [twelve] years. Furthermore, the Court does find the [D]efendant is a dangerous offender, whose behavior indicates little or no regard [for] human life. And all the *Wilkerson* factors apply.

. . . .

And so, [the Defendant], in this case, because of [his] extreme behavior as a predator of the people in this community, the Court believes that it's absolutely just to sentence [the Defendant] to consecutive sentences in each of these Counts.

As evidenced by its ruling, the trial court thoroughly considered the *Wilkerson* factors. Accordingly, the trial court's decision is reviewed for an abuse of discretion and is afforded a presumption of reasonableness. First, the trial court determined an extended sentence was necessary to protect the public from further criminal conduct by the Defendant. *See Wilkerson*, 905 S.W.2d at 939. In supporting this decision, the trial court considered the Defendant's repeated pattern of stalking and harassing women, noting that the Defendant had numerous encounters with law enforcement for similar behavior and was banned from two college campuses. Next, in supporting its conclusion that the Defendant's sentences reasonably related to the severity of his offenses, *see id.*, the trial court noted that the Defendant was a "predator" who was "hunting" for a victim on the night of the rape. The trial court also noted the Defendant's decision to drive the intoxicated victim across county lines into an area she was completely unfamiliar with and where she would have been unable to get help. The trial court did not abuse its discretion in imposing consecutive sentences, and the Defendant is not entitled to relief on this issue. *See, e.g.*, *State v. Brown*, No. W2017-00770-CCA-R3-CD, 2018 WL 1748007, at *7-8

- 24 -

(Tenn. Crim. App. Apr. 11, 2018) (affirming dangerous offender determination where the defendant "approached the victim in the State of Mississippi at her residence, transported her into Shelby County to a different location, there used a taser on multiple occasions to force her to have both vaginal and oral sex against her will"); *State v. Dillard*, No. 01C01-9804-CC-00157, 1999 WL 729205, at \*14 (Tenn. Crim. App. Sept. 20, 1999) (affirming imposition of consecutive sentencing based upon dangerous offender criterion where the defendant and his accomplice "preyed upon . . . innocent victims while they slept in the homes").

## III.    CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

 s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE